**UNITED STATES of America,
Appellant,**

v.

**Joseph F. O'NEILL and Frank A.
Scafidi, Appellees.**

**No. 79–1665.**

United States Court of Appeals,
Third Circuit.

Argued December 11, 1979.

Decided March 13, 1980.

---

Peter F. Vaira, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, Appellate Division, Theodore A. McKee (Argued), Asst. U. S. Atty., Philadelphia, Pa., for appellant.

Sheldon L. Albert, City Sol., James M. Penny, Jr., Deputy City Sol., Ralph J. Teti (Argued), Asst. City Sol., Philadelphia, Pa., for appellees.

Before ROSENN, MARIS and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

The United States has appealed from the district court's denial of the Government's motion for enforcement of administrative subpoenas issued by the United States Civil Rights Commission upon Joseph O'Neill, then Commissioner of the Philadelphia Police Department, and Frank A. Scafidi, then Chief Inspector, Internal Affairs Bureau of the Philadelphia Police Department. The portions of the subpoenas at issue here requested the production of documents and records by the City of Philadelphia relating to investigations into reports of alleged brutality on the part of named police officers.

The district court denied enforcement of the subpoenas on the basis of executive or "governmental" privilege.

### II.

#### Facts

On February 6, 1979, the United States Commission on Civil Rights (the "Commission") began a series of public hearings in Philadelphia as part of the Commission's ongoing inquiry concerning denials of equal protection of the law under the Constitution and in the administration of justice. The hearings were part of a broader national inquiry by the Commission into the possible need to revise federal legislation to deal more effectively with the problem of police abuse. The Commission was created by Congress in 1957 and empowered to investigate, study, and collect information concerning denials of constitutional rights and equal administration of justice. Civil Rights Act of 1957, Pub.L.No.85–315, 71 Stat. 634. The Commission has the authority to hold hearings and issue subpoenas for the attendance of witnesses and for the production of written material. 42 U.S.C. § 1975d(f). If any person refuses to obey the subpoenas, the Commission may apply to a United States district court for an enforcement order. 42 U.S.C. § 1975d(g).

Prior to the scheduled February 6 hearings in Philadelphia, the Commission served subpoenas upon Police Commissioner O'Neill and Chief Inspector Scafidi. The subpoenas called for the production of extensive documents relating to training, investigation and discipline in the Philadelphia Police Department. O'Neill and Scafidi supplied most of the requested material but refused to comply with Paragraph IV of the O'Neill subpoena and Paragraphs 1 through 7 of the Scafidi subpoena calling for the production of material on the Police Department's response to allegations of police brutality on the part of thirty-one named officers. Paragraph IV of the O'Neill subpoena requested, *inter alia:*

> All records, documents, reports, notes, of any description whatsoever from any

source pertaining to the investigation by the Homicide Division, the Internal Affairs Bureau, or any other part of the Philadelphia Police Department into any actions which resulted in allegations of excessive, inappropriate, deadly or illegal use of force by the following current or former police officers listed on pages 3 and 4.

The section of the Scafidi subpoena to which the City objected corresponded to Paragraph IV of the O'Neill subpoena.

Following the City's refusal to supply the requested information, the Government filed a motion to enforce the subpoena pursuant to 42 U.S.C. § 1975d(g) giving the district courts jurisdiction to require the production of "pertinent, relevant and non-privileged" subpoenaed material. Following several conferences with the district court at which some additional material was produced by the City, the Government's motion to enforce was argued on February 16, 1979.[1] The court denied the motion to enforce in an opinion delivered from the bench. The Government's subsequent motion to reconsider was also denied.

### III.

*Manner of Assertion of Privilege*

The City's refusal to comply with paragraph 4 of the subpoena was asserted orally by the City Solicitor when he appeared together with and on behalf of Commissioner O'Neill and Inspector Scafidi at the Commission's executive session on February 6, 1979, the date listed in the subpoena for compliance. At that time the City claimed compliance would violate the officers' fifth amendment privilege against self-incrimination, the attorney-client and work product privileges, and the police officers' due process rights, and that the nature of much of the material sought would tend to degrade and defame individual officers.

The City also claimed in oral argument before the district court that the police offi-cers named in the subpoena were the subject of 13 criminal actions, 30 civil actions, and potential future indictments stemming from federal and state grand jury investigations. The City claimed that release of the subpoenaed information would "materially interfere with the City's ability to properly defend outstanding lawsuits versus the City and versus the individual officers." The defense of "governmental" privilege was alluded to in the City's legal memorandum submitted to the district court. When pressed on the point during oral argument the City Solicitor stated that he would "claim executive privilege, too  . . . ."

We find unsatisfactory the manner in which the City has asserted its claim of privilege. In the first place, it was invoked orally, although there was ample opportunity to prepare a written formal claim of privilege. In the second place, it was not invoked by the department head, but by the attorney for the City. There was no affidavit, and no indication that the privilege was being invoked by the responsible public official on the representation that he had personally examined the documents and determined nondisclosure was required. In the third place, it was a broadside invocation of privilege, which failed to designate with particularity the specific documents or file to which the claim of privilege applied.

When a request for relevant documents or information is made, a claim of privilege should be interposed judiciously and not casually. Under ordinary circumstances, objection to production of documents on the ground of privilege should be made in writing. The same rationale for requiring that a party objecting to a request for production of documents under Fed.R.Civ.P. 34(b) must submit a written response specifying the objection to each category applies equally to the response to a subpoena duces tecum. This gives each party the opportunity to analyze the request and the corresponding objection, and gives the court a fuller record on which to

---

1. The number of officers whose investigating files are at issue has been reduced from 31 to 22. The City brief notes that there were no files as to some of the named officers, and the City withdrew its objection as to disclosure of certain other files.

base its ruling. It also provides some assurance that the party asserting the privilege has directed his or her attention to the scope of the claim being asserted.

The appropriate manner in which privilege should be invoked was set forth by the Supreme Court in *United States v. Reynolds*, 345 U.S. 1, 7–8, 73 S.Ct. 528, 532, 97 L.Ed. 727 (1953), where the Court said:

> There must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer. The court itself must determine whether the circumstances are appropriate for a claim of privilege . . . .

Although the Court in that case was dealing with the claim of privilege for state and military secrets, "its prerequisites for formal invocation of the privilege have been uniformly applied irrespective of the particular kind of executive claim advanced." *Carter v. Carlson*, 56 F.R.D. 9, 10 (D.D.C. 1972).

In *Smith v. Federal Trade Commission*, 403 F.Supp. 1000 (D.Del.1975), Judge Schwartz held that the FTC improperly invoked executive privilege with respect to certain documents, noting that to support a claim of executive privilege at least three requirements must be satisfied. The head of the agency claiming the privilege must personally review the material, there must be " 'a specific designation and description of the documents' claimed to be privileged," and there must be "precise and certain reasons for preserving" the confidentiality of the communications. Usually such claims must be raised by affidavit. *Id.* at 1016; see also *Black v. Sheraton Corp. of America*, 184 U.S.App.D.C. 46, 57–58, 564 F.2d 531, 542–43 (D.C.Cir.1977); *Pierson v. United States*, 428 F.Supp. 384, 392–96 (D.Del. 1977); *Center on Corporate Responsibility, Inc. v. Schultz*, 368 F.Supp. 863, 872–73 (D.D.C.1973) (claim of executive privilege involving Nixon tape rejected because not invoked personally by President who had custody of allegedly privileged matters). ■ The City contends that the privilege was properly invoked in this case because

Commissioner O'Neill and Inspector Scafidi accompanied the City Solicitor when the City Solicitor invoked the privilege on their behalf before the Commission. Although the City Solicitor's legal opinion is binding on the department head, Philadelphia Home Rule Charter 4–400, this does not operate to substitute the City Solicitor's legal judgment for the departmental responsibility of the city official. It has been suggested that it is inappropriate for the privilege to be invoked by attorneys instead of by the department head. See *Thill Securities Corp. v. New York Stock Exchange*, 57 F.R.D. 133, 138 (E.D.Wis.1972); *Carter v. Carlson*, 56 F.R.D. at 11; *but see Frankenhauser v. Rizzo*, 59 F.R.D. 339, 342 n.6 (E.D.Pa.1973). We need not decide if this is always the case, but there was no indication here that the department heads made the type of personal careful examination which must precede invocation of the privilege.

■ It is patent from the record in this case that wholesale claims of privilege were made by the City without discrimination as to the grounds for the claims and their applicability to the documents requested. For example, the claim of the Fifth Amendment privilege was interposed, although such a claim could not conceivably apply to many of the documents requested such as all citizen complaints involving the named officers, the names of all individuals charged with the responsibility of investigating any complaint against the specified police officers, and records of administrative measures taken by the Philadelphia Police Department in investigating and disposing of any complaints against the named officers. Furthermore, the Fifth Amendment privilege is personal to the person invoking it, *Rogers v. United States*, 340 U.S. 367, 371, 71 S.Ct. 438, 440, 95 L.Ed. 344 (1951); *Bowman v. United States*, 350 F.2d 913, 915–16 (9th Cir. 1965), and there is no indication that either Commissioner O'Neill or Inspector Scafidi was claiming the privilege of self-incrimination on his own behalf. Another example of the City's summary assertion of privilege is its claim of work product "privilege," in actuality not a privi-

lege at all but a protection of the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of the party concerning the litigation. *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947); *United States v. Amerada Hess Corp.*, 619 F.2d 980, at 987 (3d Cir. 1980). It is clearly inappropriate to invoke the work product protection for documents which were not the product of any attorney preparation, such as complaints filed by citizens, records of action taken by the Police Department in disposing of those complaints, and, indeed, any records of the Department's own investigations into such complaints.

The indiscriminate claim of privilege may in itself be sufficient reason to deny it. The court when faced with such a claim cannot make a just or reasonable determination of its validity. Even when the privilege has been asserted by the President of the United States, the Supreme Court has rejected it when it depended "solely on the *broad, undifferentiated* claim of public interest in the confidentiality of . . . conversations" and has refused to extend deference to a President's "*generalized interest* in confidentiality." *United States v. Nixon*, 418 U.S. 683, 706, 711, 94 S.Ct. 3090, 3107, 41 L.Ed.2d 1039 (1974) (emphasis added). See also *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 370 F.Supp. 521 (D.D.C.), *aff'd*, 162 U.S. App.D.C. 183, 498 F.2d 725 (D.C.Cir.1974) (President's assertion of executive privilege rejected because President did not permit *in camera* inspection or provide particularized description of applicability of privilege). Accordingly, the district court erred in accepting the City's claim of privilege in the form and manner in which it was interposed in this matter.

## IV.

### Commission's Assertion of Need

If a valid claim of privilege is properly invoked, the party who seeks the information must show the need for it so that the court can "balance on one hand the policies which give rise to the privilege and their applicability to the facts at hand against the need for the evidence sought to be obtained in the case at hand." *Riley v. City of Chester*, 612 F.2d 708 at 716 (3d Cir. 1979).

The functions and purposes of the Commission were summarized in the report of the House of Representatives recommending passage of legislation to extend the life of the Commission to at least 1983 and broaden its scope to cover discrimination against the handicapped. The report stated:

The Commission investigates complaints alleging the denial of the right to vote by reasons of race, color, religion, sex or national origin, or by reason of fraudulent practices. It studies and collects information concerning legal developments and also appraises Federal laws and policies with respect to the denial of equal protection of the laws which fall within its jurisdiction or in the administration of justice. The Commission further serves as a national clearinghouse for information concerning denials of equal protection of the laws because of race, color, religion, sex or national origin.

House Comm. on the Judiciary, Civil Rights Commission Act of 1978, H.R.Rep.No.95–1140, 95th Cong., 2d Sess. 2–3, *reprinted in* [1978] U.S.Code Cong. & Admin.News, pp. 2639, 2641.

According to the Government's Motion for Reconsideration filed in the district court, the Government was prepared to introduce evidence to show that the purpose of the Commission's hearings in Philadelphia was to investigate allegations of police misconduct, ascertain the nature of that misconduct, identify formal department policies and procedures relating to police conduct and discipline, identify the officials in agencies legally responsible for investigating and resolving allegations of police misconduct, and evaluate the availability and effectiveness of existing systems of accountability, both internal and external.

The Commission then planned to determine whether its findings reflected discrimination or a denial of equal protection under the Constitution, appraise the laws and policies of the Federal Government with respect to discrimination or denials of equal protection particularly as such relate to police practices, and disseminate pertinent and appropriate information. The Commission planned that its inquiry would include a case study of those particular incidents and/or officers which have received extraordinary notoriety so as to determine the effectiveness and the manner in which the internal complaint procedures have operated or failed to operate. The Commission asserts this case study is important in allowing the Commission to determine whether certain types of complaints or complaints about certain police officers are handled in a manner which is inconsistent with the stated police policies or with the manner in which other complaints are handled.

█ In the absence of any evidence to the contrary, the requested material is presumptively relevant and the Commission is presumptively entitled to enforcement of the subpoenas. Courts traditionally give wide latitude in determining relevance in the context of an administrative subpoena. *See United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950); *Endicott Johnson Corporation v. Perkins*, 317 U.S. 501, 507–509, 63 S.Ct. 339, 342–343, 87 L.Ed. 424 (1943); *Federal Trade Commission v. Texaco, Inc.*, 180 U.S.App. D.C. 390, 555 F.2d 862 (D.C.Cir.), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977). In *Perkins*, the Court stated that administrative subpoenas must be enforced if the documents sought could be pertinent to a legitimate agency inquiry. The Court found:

> The evidence sought by the subpoena was not plainly incompetent or irrelevant to

any lawful purpose of the [agency] . . . and it was the duty of the District Court to order its production for the [agency's] consideration.

317 U.S. at 509, 63 S.Ct. at 343.

█ It appears the trial court gave too little weight to the needs of the Commission, holding its need was less important than that of a private litigant. The background for the formation of the Commission and the significance of its investigation were fully considered in *Hannah v. Larche*, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960), where the Court stressed the legitimacy of its function as an investigative and fact-finding body. Thus, the relevance and need for the information sought in this case were established, and the inquiry must shift to the nature of protection from discovery claimed by the City.

## V.

### City's Claim of Privilege

In refusing to grant the Government's motion to enforce, the district court held the City had a qualified executive or governmental privilege not to disclose information with regard to matters subject to ongoing criminal investigations and pending criminal and civil litigation at a state and federal level.

█ An exhaustive consideration of the parameters of executive privilege is not required here because as discussed previously, the precise claims of the City have not been fully developed. It suffices to note that not only the proper designation of the privilege but its origin and scope have been the subject of disagreement.[2] It is accepted that executive privilege comprehends military and state secrets, *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953), and the deliberative process of high executive officials. *United States v.*

---

**2.** It has been suggested that the appropriate terminology would divide the privilege claim into a state secret privilege and an official information privilege. Comment, *Discovery of Government Documents and the Official Information Privilege*, 76 Colum.L.Rev. 142 (1976). The statements in *United States v. Nixon*, 418

U.S. 683, 708, 94 S.Ct. 3090, 3107, 41 L.Ed.2d 1039 (1974) that the executive privilege claimed by the President is "inextricably rooted in the separation of powers" has been challenged in Berger, *The Incarnation of Executive Privilege*, 22 U.C.L.A.L.Rev. 4 (1974).

*Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). There is also a privilege or protection against disclosure of certain government documents which are made confidential by statute. *See, e. g.,* Federal Aviation Act, 49 U.S.C. § 1441(e) (1976), Social Security Act, 42 U.S.C. § 1306(a) (1976). None of these aspects of executive privilege are applicable here.

Another basis on which the Government can withhold information from discovery is usually referred to as the informer's privilege, "in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *Roviaro v. United States*, 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957). The reason given by the Court for such a privilege is instructive:

> The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.
>
> The scope of the privilege is limited by its underlying purpose. Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged. Likewise, once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable.

*Id.* at 59–60, 77 S.Ct. at 627 (footnotes omitted).

The City contends and the district court agreed that material relating to ongoing civil and criminal investigations were the subject of a privilege against disclosure. We know of no Supreme Court case which provides support for such a broad amorphous Government privilege. One of the proposed Rules of Evidence, Rule 509, would have protected, in addition to "secrets of state", "official information" defined as

information within the custody or control of a department or agency of the government the disclosure of which is shown to be contrary to the public interest and which consists of: (A) intragovernmental opinions or recommendations submitted for consideration in the performance of decisional or policymaking functions, or (B) subject to the provisions of 18 U.S.C. § 3500, investigatory files compiled for law enforcement purposes and not otherwise available, or (C) information within the custody or control of a governmental department or agency whether initiated within the department or agency or acquired by it in its exercise of its official responsibilities and not otherwise available to the public pursuant to 5 U.S.C. § 552.

*See* H.R. 5463, 93d Cong., 1st Sess. (1973). The proposal elicited adverse reaction. The American Bar Association's Special Committee on Federal Practice reported that "[t]he Committee urges that Rule 509 be reviewed and reconsidered to make it consistent with the *Freedom of Information Act* with the view of placing the government in the same position as any other percipient witness insofar as the imposition of a duty to disclose relevant evidence is claimed." *Rules of Evidence (Supplement), Hearings before the Subcomm. on Criminal Justice of the House Comm. on the Judiciary*, 93d Cong., 1st Sess. 339, Ser. No. 2 (1973). A statement on behalf of the Association of American Publishers, Inc. was particularly critical of Rule 509 and contained the following comment:

> With respect to other official information, we question whether such a category for privilege was ever before in existence. Its broadness and lack of compelling need for non-disclosure is indicated by the Rule itself, which allows any attorney representing the government to assert the privilege. The mere requirement that the disclosure be shown to be contrary to the public interest does not begin to bring it within the realm of genuine national security requirements. Indeed,

it could be argued that any information which might be embarrassing to government officials could be contrary to the public interest by weakening the public's confidence in its officials. Yet, that is exactly the kind of information to which the public, let alone any parties in litigation with the government, is entitled. *Id.* at 24.

Congress refused to accept the privilege formulations contained in the proposed rules of evidence and substituted instead Rule 501 which requires that in civil actions as to which state law does not supply the rule of decision, "the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed.R.Evid. 501.

██ Despite language in some lower court opinions which appears to accept the concept of general confidentiality of investigatory files, closer analysis shows that most of the cases relied upon by the district court were really instances dealing with the applicability of one of the aspects of Executive Privilege heretofore acknowledged by the Supreme Court.[3] Thus, for example, in *United States ex rel. Jackson v. Petrilli,* 63 F.R.D. 152 (N.D.Ill.1974), and *Gaison v. Scott,* 59 F.R.D. 347 (D.Hawaii 1973), the courts were being asked to protect the identity of informers and sources of information deemed necessary to encourage the full disclosure of information to Government investigators. In *Carter v. Carlson,* 56 F.R.D. 9 (D.D.C.1972), the court was considering a variation of the privilege for the decision making process recognized in *United States v. Nixon* under which internal government

communications offering opinions and recommendations are protected. This protection recognizes the need to safeguard free expression in giving intragovernmental advice by eliminating the possibility of outside examination as an inhibiting factor. See *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 40 F.R.D. 318, 326 (D.D.C.1966), *aff'd sub nom. V.E.B. Carl Zeiss, Jena v. Clark,* 128 U.S.App.D.C. 10, 384 F.2d 979 (D.C. Cir.), *cert. denied,* 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967). Other courts, while articulating the existence of a privilege of the Government to withhold documents in the "public interest", found that such interest did not justify the resistance to disclosure, *see Frankenhauser v. Rizzo,* 59 F.R.D. 339 (E.D.Pa.1973), *cf. Dos Santos v. O'Neill,* 62 F.R.D. 448 (E.D.Pa.1974), and thus are questionable precedent on which to base the existence of such a privilege.[4]

We do not deem it appropriate to extend the scope of Executive Privilege in this case beyond the lines drawn to date by the Supreme Court.[5] There is an anomaly in the assertion of a public interest "privilege" by the City to justify withholding information from a federal Commission charged by Congress to investigate in the public interest the possible denial of equal protection by, inter alia, local governmental units. Obviously, the court cannot accept the City's assertions of public interest *ipse dixit.* We note that the district court made its ruling without examination of the files.

On remand, if the City persists in its resistance to discovery of the files by interposing specific claims of privilege in an appropriate manner, the district court will be obliged to balance the need of the Commission against the concerns of the City, if they are found to be legitimate, because

---

3. The cases cited by the district court which are in reality cases involving internal security investigation, such as *Kinoy v. Mitchell,* 67 F.R.D. 1 (S.D.N.Y.1975) and *Jabara v. Kelley,* 75 F.R.D. 475 (E.D.Mich.1977), are on their face inapplicable here.

4. In the oft cited case of *Brown v. Thompson,* 430 F.2d 1214 (5th Cir. 1970), the issue of a privilege for investigatory files was not raised

on appeal. The only issue was whether dismissal should have been with prejudice.

5. In light of the posture of this case, we express no view as to whether the scope of Executive Privilege available to a state or municipality in a federal cause of action is comparable to that applicable to the federal government. *Cf. In re Grand Jury Proceedings,* 563 F.2d 577 (3d Cir. 1977).

Executive Privilege is, at most, a qualified one. The court must give more consideration to an appropriate method by which that which is legitimately privileged, such as the identity of confidential informers, if any, or intragovernmental policy discussions, may be shielded while the relevant factual data is disclosed. In this connection, the court may want to use the *in camera* examination device, considered sufficiently protective of the sensitive material involved in *United States v. Nixon*, 418 U.S. at 706, 94 S.Ct. at 3106.

After an *in camera* investigation the court will be in a position to ascertain whether the files contain primarily factual data which can be disclosed. Thus, for example, in *Wood v. Breier*, 54 F.R.D. 7, 10 (E.D.Wis.1972), the court refused to shield a police investigatory file from disclosure, holding: "All the material in the file is of a factual as opposed to a policy discussion nature, and nowhere in the file are there any recommendations made for future action or criticisms of past actions."

Even if the City could legitimately seek to shield from discovery information relating to police officers who are defendants in pending criminal actions, a claim on which we express no view, the Commission's offer to take some evidence in executive session may provide adequate protection from excessive publicity which might interfere with a fair trial. The Commission also agreed to accept the documents with the excision of the identity of the police officers involved and we are therefore puzzled by the district court's failure to accept that offer on the grounds that the information in that form would negate the Commission's purposes. Since it is the Commission's inquiry, we assume the utility of the information is best left to it. The Commission has indicated that the thrust of its inquiry is not directed to allegations that a particular officer may have been guilty of police brutality but to the procedure followed by the Police Department in cases where police brutality was alleged. Thus the identity of the individual police officer is far less relevant to the Commission than documents showing whether an investigation was made, when it

was made, how it was conducted, and what subsequent action was taken.

Finally, we note that more than a year has now elapsed since the information was originally requested. It may be possible that subsequent events and the passage of time have caused some modification in the City's position. We are confident that the district court will direct its attention to this matter promptly so that the Commission's investigation, long delayed, can proceed expeditiously.

Accordingly, we will vacate the district court's order refusing the Commission's motion to enforce and will remand for further proceedings consistent with this opinion.