G–69, a/k/a DG–2, and his wife, Plaintiffs,

v.

John **DEGNAN**, et al., Defendants.

Civ. No. 86–3282(SSB).

United States District Court, D. New Jersey, Camden Vicinage.

Feb. 28, 1990.

Pamela W. Higgins, Sprague, Higgins & Creamer, Collingswood, N.J., for plaintiffs.

Bernard F. Conway, Sean Deverin, Giblin, Combs, Cooney & Conway, Morristown, N.J., for Atty. Gen. defendants John Degnan, Irwin I. Kimmelman, Barry Goas, David Brody and Donald Belsole.

George F. Kugler, Jr., John C. Connell, Archer & Greiner, Haddonfield, N.J., for State Police defendants Clinton L. Pagano, Louis Taranto, Justin Dintino, Robert Winters, Joseph Guzzardo, Estate of William P. Sullivan, Joseph Calabrese and John Bogdan.

Robert J. Del Tufo, Atty. Gen. of the State of N.J. by Madeline W. Mansier, Deputy Atty. Gen. Jerry Fischer, Deputy Atty. Gen. Trenton, N.J., for intervenor State of N.J.

## OPINION

JEROME B. SIMANDLE, United States Magistrate:

This matter is before the court upon motions of the Custodian of Records, Department of Law and Public Safety. The first motion seeks a protective order pursuant to Rule 26(c), Fed.R.Civ.P., as to eleven (11) documents (and later two other documents) which the State intervenor, through former Assistant Attorney General Eugene Sullivan, has claimed to be protected from discovery either as irrelevant to plaintiffs' case or under the governmental privilege for law enforcement materials; the State also claims that one of those eleven documents was inadvertently produced and the State seeks an Order compelling plaintiffs' counsel to return it.

In the second motion, the State seeks a protective order barring production of criminal investigation files of nonparties about whom plaintiff G–69 gave information. Both motions are now decided.[1]

I. *Factual Background and Procedural History*

Plaintiff G–69, a pseudonym, was a paid confidential informant for the New Jersey State Police during the early 1980's. His work involved various undercover capacities in casino and bar settings in Atlantic City, where he provided information to law enforcement authorities concerning various matters, stemming from organized crime violence to suspicious activities of others. Some information played a role in ongoing investigations, other information did not.

There came a time when his role as an informant was discovered by a previous criminal acquaintance who recognized G–69 in an undercover capacity. G–69, allegedly in fear of his life, relocated elsewhere and sought to enforce promises made to him by various representatives and employees of the State.

This action, arising under 42 U.S.C. § 1983 and pendent state claims, alleges that the defendants breached their contract with G–69 in a manner interfering with his constitutional right of travel by denying him and his wife emergency relocation payments, redocumentation of new identities, health insurance, and weekly payments of cash as necessary to provide for financial well-being.

Much of the procedural history is set forth in the Opinion of January 22, 1990,

---

1. The first motion was filed June 26, 1989, and the second was filed July 18, 1989. Action on both motions was deferred pending discussions between the parties, as confirmed by my letter of September 22, 1989. As those discussions have ended without resolution, these motions are ripe for decision.

which decided the motion of the State of New Jersey, as Intervenor, for a protective order as to a group of assertedly confidential documents which were withheld in whole or in part. 130 F.R.D. 326. That group of documents had originally been identified as confidential under the governmental privilege for prosecutorial files; the claims of privilege as to the original group of 63 documents were narrowed and various documents were produced in redacted form on May 5, 1989, which were thereafter reviewed *in camera*, as discussed in the above Opinion, pursuant to which the State's claims of privilege were upheld in part and overruled in part.

The State now seeks to withhold two groups of documents. The first is a group of eleven documents for which the State Police Defendants[2] have withheld from a court-ordered production of various personnel files. At a hearing on April 21, 1989, this court had ordered the State Police Defendants to produce certain file documents to the plaintiffs, or to claim a particularized privilege as to any withheld document, by May 5, 1989, subsequently extended to May 8, 1989.

An attorney for the State Police Defendants, John C. Connell, Esquire, reviewed the documents to be produced on May 8, 1989, which consisted of almost 400 documents totaling approximately 1,200 pages. (Connell Certification, dated June 22, 1989, at ¶ 4.) Former Assistant Attorney General Sullivan, on behalf of the State as Intervenor herein, reviewed the documents on behalf of the Attorney General's Office, and on May 4, 1989, he directed Mr. Connell to withhold the eleven documents from production in the 400–document batch, because the State was claiming the privilege. (Letter of Sullivan to Connell, dated May 4, 1989, hereafter "Sullivan Letter," copy attached to Connell Certification.)

The State's basis for withholding each of the eleven documents was set forth in the Sullivan Letter on a document-by-document basis following Sullivan's review assisted by the State Police Intelligence Unit. Mr. Connell arranged for delivery of the non-privileged documents to plaintiffs' counsel on May 8. Among the disclosed documents was one that was inadvertently disclosed to plaintiffs' counsel, entitled "Winters Document No. 101." Mr. Connell discovered the mistaken disclosure on the morning of May 9, and he called plaintiffs' counsel that same day to request its return. Plaintiffs' counsel, Pamela Higgins, Esquire, refused to return Winters Document No. 101 to Mr. Connell, claiming that "[i]nadvertent disclosure constitutes a waiver of any claim of privilege. Moreover, my review of the document discloses that no privilege could properly attach to the document and it is clearly discoverable." Higgins Letter to Connell, dated May 17, 1989.

When at a June 15, 1989 conference it appeared that neither the State nor the State Police Defendants had filed a motion for a protective order to support their claim of privilege, I directed counsel for the State to file an appropriate motion for a protective order and to submit the withheld documents (including redacted documents) to me for inspection *in camera* by June 26, 1989. The State's motion thus seeks to compel Ms. Higgins to return the Winters Document No. 101, and the State has submitted each of the documents for *in camera* review in support of a protective order approving nondisclosure.

The specific documents for which a protective order is sought is itself a matter in some dispute, because the State's present motion was underinclusive. While the State claimed privilege for eleven documents,[3] Mr. Connell, on behalf of the

---

**2.** The "State Police Defendants" are Clinton L. Pagano, Louis Taranto, Justin Dintino, Robert Winters, Joseph Guzzardo, Estate of William P. Sullivan, Joseph Calabrese and John Bogdan. The "Attorney General Defendants" are John Degnan, Irwin I. Kimmelman, Barry Goas, David Brody and Donald Belsole.

**3.** Documents submitted *in camera* with the motion were:
    (1). Memo, Winters to "Jim," 11/1/84
    (2). I, 2 [Winters 104]
    (3). II, 1 [Winters 10]
    (4). II, 2 [Winters 11]
    (5). II, 3(a) [Winters 39 & 101 (duplicates)]
        II, 3(b) [Winters 40]
    (6). II, 4 [Winters 84 & 88 (duplicates)]

State Police Defendants, also failed to disclose several others. Mr. Connell's supplemental withholding came to light through Ms. Higgins' comparison of disclosed documents to Mr. Connell's correlation index. The additional documents withheld by Mr. Connell, were: Dintino 7, Dintino 8, and Winters 85, 109, 110, 124 and 133. Four of those documents (Winters 109, 110, 124 and 133) were already submitted to the court pursuant to the State's motion for protective order, and their discoverability was determined in the Opinion of January 22, 1990 and will not be further considered.[4] The State then also disclosed and waived its privilege as to Winters 85.[5] The net result is that only two additional withheld documents—Dintino 7 and Dintino 8—have been identified, and plaintiffs' position on these additional documents has been supplementally briefed, and the court will consider these as part of the motion,[6] which will be discussed further below.

The State's second discovery motion had its origin in the Discovery Conference of June 15, 1989. At that Conference, plaintiffs' counsel, Ms. Higgins, took the position that plaintiffs have a right to inspect all investigative files of third persons in which plaintiff G–69 acted as an informant, to obtain all materials, documents and records relating to the State's criminal investigations, lying beyond G–69's involvement or statements, for the sake of inquiring into the thought processes of the prosecutors regarding those cases and the uses they made of G–69's information.

> (7). II, 5 [Winters 91]
> (8). II, 6 [Winters 122]
> (9). II, 7 [Winters 126]
> (10.) II, 8 [Winters 134]
> (11.) III, 1 [Guzzardo 206 et seq.]

**4.** Winters 109 is the first page and Winters 110 is the second and third pages of Document D–225, as to which the court found that the withheld portion of D–225 was not subject to further disclosure. Opinion at 25. Winters 124 is the same as A–44, as to which the court found that the single withheld portion was not subject to further disclosure. Opinion at 22. Winters 133 is the same as A–41, as to which the court found that the withheld portions were properly withheld. Opinion at 21. Nothing presently before me persuades me that those determinations should be reconsidered.

Defense counsel took the position at the June 15th Conference that the issues in this suit do not involve the quantity or quality of information provided by G–69, nor the success of prosecutions built upon his information, and that the prosecutors' thought processes are irrelevant. Counsel indicated that they intended to seek a ruling, by motion for partial summary judgment, for a determination that the continuation or termination of criminal investigations in which G–69 participated as an informant are not in dispute in this case, which is essentially seen as a breach of contract action. Defendants' motion for partial summary judgment was to have been filed by July 18, 1989, to be returnable August 18, 1989 before the Honorable Stanley S. Brotman. Defendants filed no such motion, one of the attorneys for the Attorney General Defendants, Sean G. Deverin, Esquire, indicated that defendants would not be filing such a motion at this time. (*See* Deverin Letter dated July 13, 1989).

Instead, the State filed this motion to protect criminal investigation files of nonparties about whom G–69 may have given information.

These motions will be considered in order.

## II. *Discussion of Law*

### A. Motion for Protective Order as to Thirteen (13) Documents

■ The State asserts governmental privilege or irrelevance as its basis for

**5.** Supplemental Brief in Support of Motion, dated July 10, 1989, at 3.

**6.** Plaintiffs argue that the request for a protective order is untimely as to Dintino 7 and Dintino 8, because the State did not supplement its motion to add these documents until July 10, 1989, beyond the June 26, 1989 deadline for filing. This two-week delay was inadvertent, caused by miscommunication between Mr. Connell and Deputy Attorney General Mansier, and resulted in no prejudice because the new documents were the subject of supplemental briefing prior to the original return date of the motion. The court sympathizes with Ms. Higgins' observation, however, that it should not have required Ms. Higgins' detective work, comparing lists of documents, to get an accurate grouping of the withheld documents.

withholding the thirteen documents in this set. The governmental privilege (or "official privilege") in criminal investigation files is a qualified privilege requiring balancing the needs of law enforcement and the importance of the information sought to the plaintiff's case, among other considerations, as discussed in the Opinion of January 22, 1990, citing *United States v. O'Neill*, 619 F.2d 222 (3d Cir.1980) and *Scouler v. Craig*, 116 F.R.D. 494 (D.N.J. 1987), *inter alia.* That discussion need not be repeated here, as the same factors inform this court's *in camera* review of the present documents, which follows.

(1) *Document I, 1 [no counterpart number]*—This informal memo from defendant Winters to a "Jim," dated 11/1/84, is said to be irrelevant to plaintiff's case. Having reviewed the document, this court confirms that it does not mention G–69, but it appears to be relevant to his claims in this lawsuit to the extent that he alleges denial of contractual payments. It further appears that no sensitive investigation or prosecutory technique would be threatened by disclosure of this document, which is found to be discoverable. The accompanying Order will compel discovery.

(2) *Document I, 2 [Winters 104]*—This informal memo from Capt. J.R. Dowd dated March 5, 1985, was partially disclosed. The non-disclosed portion was properly withheld as it would reveal the identity of another confidential informant and the methodology for investigating a target, not G–69. Properly withheld.

(3) *Document II, 1 [Winters 10]*—The title of this State Police Standard Operating Procedure, No. E25, dated September 30, 1983, is "Procedural Guidelines for Conducting Major Conspiracy and Undercover Operations." This internal policy statement contains guidance on State Police decisionmaking in pursuing major conspiracy investigations, acquiring business fronts ("proprietary interests"), obtaining authorization to conduct undercover operations, supervision of undercover operations, and authorization to commit illegal acts in the course of undercover investigation. This policy directive concerns confidential law enforcement methods and tactics, including decisionmaking parameters for initiating, conducting and ending undercover operations. This sort of policy and guidance regarding the State Police methods and tactics is entitled to almost absolute protection, as disclosure could, as argued by the State, cripple the effectiveness of such undercover operations. *Kelly v. City of San Jose*, 114 F.R.D. 653, 666 (N.D.Cal.1987); *King v. Conde*, 121 F.R.D. 180, 192 (E.D.N. Y.1988).

In the present case, the decisions to initiate operations, to acquire business fronts, to obtain authorization to conduct operations, and to obtain authorization to commit illegal acts are not relevant to plaintiff's claim. The claim instead is largely contractual, and there is only one portion of this document concerning the personnel relationship, namely Subpart III.D.3(d), concerning the decision of the Division of State Police to employ an informant.

This relevant subpart III.D.3(d) should be disclosed, because its relevance far outweighs whatever the potential risk of harm to law enforcement interests may be. Unlike all other sections of these guidelines, this subpart concerns the employment or agency relationship between the Division of State Police and the informant. The accompanying Order will compel production of *the interrogatory material through the conclusion of Part I, "Authority," together with subpart III.D.3(d), and the signature block appearing at the end of the last page;* the remainder was properly withheld.

(4) *Document II, 2 [Winters 11]*—This memo from Sullivan to Dowd was produced in redacted form. The withheld information consists of two paragraphs. Both paragraphs describe information given to Sullivan by G–69 regarding subjects then allegedly under investigation by media representatives. These statements by G–69 are properly discoverable by him, as they relate to his discussions with news/entertainment media concerning his impasse in obtaining back payments and expenses. The persons mentioned in the two redacted paragraphs include one defendant in this

case and other persons who have been in public life, none of whom was indicated to be under suspicion of any wrongdoing, so there is only a weak law enforcement interest in preserving this confidentiality. The two redacted paragraphs of this document shall be disclosed.

(5) *Document II, 3(a) [Winters 39 & 101 (duplicates)], and Document II, 3(b) [Winters 40]*—Document II, 3(a) is a memo from Goas to Belsole, dated 3/1/85. Document II, 3(b) is a memo from Brett to Goas, dated 2/27/85.

Document II, 3(a) is the document inadvertently disclosed to plaintiffs' counsel on May 8, 1989, which Mr. Connell demanded be returned on May 9, which Ms. Higgins refused despite not having read the document. Part of the State's present motion seeks the return of this document. It appears that this document is also *A-49* which was reviewed *in camera* and found to have been improperly withheld in the Opinion of January 22, 1990, at 23. This document was thus compelled to be disclosed in its entirety as *A-49*. This disclosure moots the controversy regarding the identical documents designated Document II, 3(a) [Winters 39 & 101], and it also moots the dispute regarding the inadvertent disclosure to plaintiffs' counsel occurring on May 8, 1989.

Document II, 3(b) [Winters 40] was produced by the State to plaintiffs' counsel in its entirety,[7] and no dispute exists. The two memos [II, 3(a) and II, 3(b)] were grouped together because both memos resulted from an interview of G–69.

Accordingly, the dispute with respect to these documents is moot.

(6) *Document II, 4 [Winters 84 & 88 (duplicates)]*—This document is a memo from Sullivan to Winters dated December 10, 1985. The memo concerns an investigative request from another law enforcement agency outside of state government pertaining to criminal matters then under investigation by the requesting agency. It further appears from this document that

responsive materials did not exist. Although there is mention of G–69 in two aspects of the request, the context does not suggest that this memorandum is relevant to G–69's status, while revealing the memorandum would disclose the existence of investigations before another law enforcement agency. Properly withheld.

(7) *Document II, 5 [Winters 91]*—This document is an interoffice communication from Winters to Taranto on 10–28–85, and the return communication from Taranto to Winters on 10–30–85. This memo pertains to a request for information received from another agency, but it does not disclose the existence or nature of any ongoing investigation by the State Police or the other agency. The memo makes mention of the need for selective disclosure of information without indicating in any way the information involved. This document is relevant to G–69's status as a State Police informant and, in general terms, to G–69's potential use by another agency stemming from his work as a State Police informant.

The law enforcement interest in confidentiality of this document would appear to be weak. At most, the document notes some degree of generalized cooperation between the State Police and another law enforcement agency which lacks specifics. The plaintiff's interest in discovery of this document is greater due to its references to his work and the potential use of his services by another agency.

Document II, 5 [Winters 91] was thus improperly withheld and shall be disclosed pursuant to the accompanying Order.

(8) *Document II, 6 [Winters 122]*—This document, a memo from Brady to Goas dated 10/31/84, has already been reviewed as *D-222* in the Opinion of January 22, 1990 at 25. *D-222* was found to be discoverable in part, and other redactions were upheld. No further dispute remains.

---

**7.** Plaintiffs' counsel's inquiry (Opposition Brief at 7) whether Winters 40 was produced in its entirety would appear to be answered affirma-

tively, as the six page version of this document reviewed *in camera* contains no redactions.

(9) *Document II, 7 [Winters 126]*—This document is an FBI memo dated 8/15/84, previously marked *D–220* and inspected *in camera* in the Opinion of January 22, 1990 at 25, which ordered full disclosure. No further dispute remains.

(10) *Document II, 8 [Winters 134]*—This document was also already inspected *in camera* as *A–48* in the Opinion of January 22, 1990 at 22–23, which ordered disclosure. No further dispute remains.

(11) *Document III, 1 [Guzzardo 206 et seq.]*—This document is a background investigation conducted by the Division of Gaming Enforcement in reference to G–69's pending application for a junket license, dated 9/18/81. This document has previously been disclosed in its entirety, as it properly should have been. The State's argument for confidentiality in its Brief at 14–15 again rings hollow. Even after plaintiffs' counsel brought this disclosure to the court's attention (Opposition Brief at 10), the State's Reply Brief offers no explanation for the State's belief that this background investigation should be the subject of this confidentiality. Accordingly, it again appears that no dispute exists, disclosure having been made.

(12) *Document Dintino 7*—This document is a memo from Dintino to Morely dated May 12, 1986, that was produced to plaintiffs' counsel in redacted form. The document was part of the supplemental submission for *in camera* inspection. The State's description of the document as a memo from Morely to Dintino is incorrect [see State's Supplemental Brief at 3]. Two short paragraphs have been redacted.

This first paragraph, reciting a confidential policy of the Division of Gaming Enforcement, pertains to the existence of other informants without in any manner identifying them or their activities. This policy would apply to G–69 as well, and its disclosure would not impair any law enforcement

values, and the existence of this policy may have a direct bearing on plaintiff G–69's claims. The first redacted paragraph was improperly withheld and shall be disclosed, as the State has not met its burden of demonstrating confidentiality.

The second redacted paragraph, on the other hand, makes reference to specific informants other than G–69, and the investigations and prosecutions in which they have been involved. Moreover, the second redaction does not appear to contain relevant information. The second redaction was proper.

Thus, with respect to Document Dintino 7, the *first redacted paragraph (being the second paragraph from the top of page two)* shall be disclosed pursuant to the accompanying Order, while the second redaction was proper.

(13) *Document Dintino 8*—

Dintino 8 is a letter from Dintino to Pagano dated August 27, 1986, withheld in its entirety. The correspondence concerns the plaintiffs' Complaint and is protected communication of a litigant to a co-defendant pertaining to defense of this litigation. The document contains no information relevant to the merits of the complaint, and it was properly withheld.

For the above reasons, the State's motion for a protective order will be *granted* as to Document I, 2 [Winters 104], Document II, 4 [Winters 84 & 88 (duplicates)], and Document Dintino 8. The motion will be *denied* as to Document I, 1 [no counterpart member], Document II, 1 [Winters 10] (in part), Document II, 2 [Winters 11], Document II, 5 [Winters 91], and Document Dintino 7 (in part), as to which disclosure will be compelled within fourteen (14) days.[8]

The motion will be *dismissed as moot* as to documents already disclosed or which were the subject of an earlier *in camera* inspection, namely: Document II, 3(a)

---

**8.** The disclosure of these documents or portions will be subject to the provisions of the Confidentiality Order entered January 22, 1990, for reasons set forth in Part III of the Opinion of January 22, 1990, because the court continues to

be of the opinion that these documents, although disclosed for plaintiffs specific use in this case, remain sensitive law enforcement material not publicly available. The accompanying Order will so provide.

[Winters 39 & 101 (duplicates)], and Document II, 3(b) [Winters 40]; Document II, 6 [Winters 122]; Document II, 7 [Winters 126]; Document II, 8 [Winters 134]; Document III, 1 [Guzzardo 206 *et seq.*].

The motion for return of Document III, 3(a) [Winters 101] is *dismissed as moot,* the document being fully discoverable as A–49 pursuant to the Opinion and Order of January 22, 1990.

The accompanying Order will be entered.

## B. Motion for Protective Order Barring Production of Criminal Investigation Files of Non–Parties

■ The State seeks a protective order barring the production of criminal investigation files of non-parties in those cases where G–69 provided information to the State during his tenure as a confidential informant. The State bears the burden of persuasion that a protective order is necessary, by articulating the harm to the State's interests which would flow from such discovery. *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1121 (3d Cir. 1986), *cert. denied,* 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987). The State urges that the investigative file information sought by plaintiffs is both irrelevant to plaintiffs' claims and protected by the confidentiality afforded law enforcement investigative documents.

Plaintiffs' demand for all investigative and prosecutorial files in which G–69 played an informant role comes upon the heels of production of many thousands of pages of documents. Those productions have included all statements by G–69, all information bearing directly upon his employment status, and hundreds of pages of reports by State Police supervisors of the undercover operations in which he played a role.

Plaintiffs allege that G–69 is entitled to learn what the State did with the information he supplied to the defendants, such as whether leads were pursued, prosecutions launched, or prosecutions terminated. As an informant, he asserts that he risked his life and livelihood for the sake of aiding law enforcement, and if the state failed to exploit his efforts in successful prosecutions, then his efforts were in vain. The essential cause of action herein "is premised on the activity of law enforcement officials in coercing an individual to act as a confidential informant and then reneging on an agreement to provide for him after his undercover identity was revealed." Opposition Brief at 7.

The investigative and prosecutorial files are also sought in order to discover the motivations of the defendants in their decisions toward G–69 which is confirmed by others or regarded by defendants as trustworthy, and to blunt "the credibility attacks that defendants must concede they intend to launch against G–69." *Id.*

A review of the Complaint does not reveal any basis for plaintiff's assertion of a right to challenge or control the use of the information he gathered. The various provisions of the "Memorandum of Understanding" [attached as Exhibit C to the Complaint] describing the alleged agreement of the parties and the remuneration to be paid under it are not helpful to plaintiff's present argument.

Under the Memorandum of Understanding, G–69 promised to cooperate fully with the State regarding one investigation—the investigation of high ranking members of organized crime who were then believed to be conducting operations out of T.K.'s Pub in Atlantic City. *Id.* at ¶ 1. G–69 agreed to provide information and to testify before the Grand Jury, *id.* at ¶¶ 3 and 4, and to submit to polygraph exams, *id.* at ¶ 5, and to refrain from being "knowingly untruthful, false or misleading regarding these activities." *Id.* at ¶ 8.

The Memorandum further recites that should G–69's informant status "be revealed during the course of the investigation described herein thereby placing his life in jeopardy, the State will assist him and provide him with the financial resources sufficient to insure his safety and relocation." *Id.* ¶ 9.

The Memorandum listed the duties and responsibilities of the State if G–69's informant role were revealed, such as "[f]ull protection as is reasonably requested," sup-

plying redocumentation of identity which is "requested and required," providing "emergency costs of transportation subsistence and housing pending redocumentation," together with "payment of full health insurance benefits and $600 per week." The $600 weekly payment was to be "provided for a reasonable time period agreeable to both parties." *Id.* ¶ 12(a), (b), (3), (g) & (j).

Plaintiffs' counsel has alleged that G–69 had a right to receive payment for services rendered through the completion of the trials and appeals of the undercover investigations in which he was involved, and thus that the criminal investigation files are necessary in their entirety to assure that the defendants did not terminate prosecutions to avoid paying G–69. The Memorandum of Understanding required G–69 to "testify fully and truthfully before any Grand Jury or court proceedings emanating from this investigation." *Id.* ¶ 3. The plaintiffs have not identified language requiring or implying that the State would employ G–69 throughout the course of all trials and appeals, especially if he did not testify.

Regarding credibility or reliability of G–69, there have already been produced many documents, together with others reviewed by this court and ordered to be produced, reflecting upon G–69's credibility. Depositions of many defendants and other witnesses may also provide insights into defendants' view of G–69's credibility. The reconstruction from criminal investigative files of numerous pieces of investigatory information provided from other law enforcement sources and methods, whether or not corroborative of G–69's information, would be an exercise in unjustified intrusion into the law enforcement process, for several reasons.

First, although credibility is always an issue for any witness or party, G–69's credibility or truthfulness *as an informant* has not been put into issue. This case does not allege he was terminated as an informant, for example, for alleged falsehoods or unreliability.

The Complaint instead alleges that defendants failed to provide plaintiffs with security and income to live in compliance with the agreement (Count I), that defendants failed to provide for plaintiffs' personal safety and financial well-being after plaintiff G–69's identity had become known (Count II), that defendants fundamentally misrepresented material facts as to their intentions to provide for plaintiffs' compensation, safety and well-being (Count III), that defendants intercepted plaintiffs' mail and wiretapped their telephone conversations (Count IV), and both intentional and negligent infliction of emotional distress (Counts V and VI). These allegations pertain to the underlying contractual agreement, except for the alleged wiretapping and mail searches which have already been the object of other discovery. None of these allegations relates to the use which the defendants made of the information G–69 supplied to them.

The defendants have convincingly demonstrated that the harm to prosecutorial interests and to third parties, such as other confidential informants, witnesses and innocent persons involved in these investigations, far outweigh the limited relevance to plaintiffs' case in obtaining the investigative and prosecutorial files.

First, informant G–69 was but one actor in any of these numerous investigations. Investigative and prosecutorial resources, including other agencies of government investigating organized crime, may come to bear in the typical file. In terms of proportionality alone, *see* Rule 26(b)(1)(iii), Fed.R. Civ.P., plaintiffs' discovery request is unduly burdensome given the limited relevance of third-party files to plaintiffs' claims, as discussed above.

Second, as the State has argued, discovery of this information would disclose identities of informants whose identities are entitled to protection, *United States v. O'Neill, supra,* 619 F.2d at 229, just as G–69's informant identity was to be protected. Plaintiffs' assertion that he probably already knows who these other sources are is quite doubtful given the broad scope of these investigations and their inter-agency nature. It would be unusual police practice to reveal to one informant the identi-

ties of all others working on related investigations.

Third, the files would contain raw information about the innocent as well as the guilty. Innocent third parties who have been interviewed as witnesses, for example, should not be faced with risk of exposure where the disclosure confers no countervailing benefit upon the cause of justice, as in the present circumstances.

Fourth, the files would contain indications of law enforcement methods, some known and others unknown to G–69, which should remain confidential to protect their effectiveness, see *Kelly v. City of San Jose*, 114 F.R.D. 653, 666 (N.D.Cal.1987); *King v. Conde*, 121 F.R.D. 180 (E.D.N.Y. 1988).

Fifth, the files would contain indications of prosecutorial discretion in the criminal justice process, which is presumptively beyond discovery. The societal value placed upon preserving and protecting prosecutorial discretion is reflected in the federal common law, *see Imbler v. Pachtman*, 424 U.S. 409, 423, 96 S.Ct. 984, 991, 47 L.Ed.2d 128 (1976) (protecting by prosecutorial immunity the exercise of "the independence of judgment required by [the prosecutor's] public trust"), and under the law of New Jersey, *see State v. Hermann*, 80 N.J. 122, 127, 402 A.2d 236 (1979) (recognizing the "broad discretionary powers in the discharge of the manifold responsibilities of his office"), *and State v. LeVien*, 44 N.J. 323, 326, 209 A.2d 97 (1965) (prosecutorial discretion "uncontrolled by the judgment and conscience of any other person" even includes denial of right by a criminal to insist on the State's instituting proceedings against him). The exercise of such discretion, especially in organized crime cases, would be chilled by wholesale exposure of criminal files, whether prosecuted or unprosecuted. Plaintiffs have argued that such disclosure is relevant to their assertion that the State had a contractual duty with G–69 to keep such cases going and to pay him a monthly stipend; nothing in the alleged contract would support this strained "duty" and, even if it did, it would be ludicrous to think that a prosecutor would terminate a viable organized crime prosecution to save the $600 per week State payment to G–69. This aspect of plaintiffs' argument is a make-weight falling far short of matching the State's overwhelming need for preserving the confidentiality of prosecutorial decisionmaking in third-party files.

Sixth, the relevant information plaintiff seeks regarding his treatment as an informant, his statements to State Police supervisors, information bearing upon his agreement and relocation, information concerning defendants' conduct as reflected in their personnel files and supervisory evaluations and reports, and a myriad of other discovery has already been provided. Disclosure of these remaining files would be unduly intrusive and burdensome given the availability of highly relevant information from other sources, pursuant to Rule 26(b)(1)(i) and *Frankenhauser v. Rizzo*, 59 F.R.D. 339, 344 (E.D.Pa.1973); *Crawford v. Dominic*, 469 F.Supp. 260, 263 (E.D.Pa. 1979).

For all these reasons, the motion by the State for a Protective Order Barring Production of criminal investigative files of non-parties will be *granted*.