[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No.  13-10281
_____

In re: MIKE HUBBARD,
        DEL MARSH,
        BOB RILEY,

                                                        Petitioners.

_____

No. 13-10283
_____

ALABAMA EDUCATION ASSOCIATION,
an Alabama non-profit corporation,
A-VOTE,
an Alabama political committee,
PAM HILL,
JEFF BREECE,
CHASSITY SMITH, et al.,

                                                    Plaintiffs-Appellees,

ASEA, et al.,

                                          Intervenor Plaintiffs-Appellees,

versus

ROBERT BENTLEY,
in his official capacity as Governor of
the State of Alabama and President of
the State School Board,

Defendant-Appellant,

JOSEPH B. MORTON,
in his official capacity as Superintendent
of Education, et al.,

Defendants,

DEL MARSH,
MIKE HUBBARD,
BOB RILEY,

Movants-Appellants.

_____

No. 13-10382
_____

D.C. Docket No. 5:11-cv-00761-CLS

In re: ROBERT BENTLEY,

Petitioner.

_____

On Petitions for Writ of Mandamus and Appeals from the United States District
Court for the Northern District of Alabama
_____

(October 14, 2015)

Before ED CARNES, Chief Judge, TJOFLAT, Circuit Judge, and MARRA,[*]
District Judge.

_____

[*] Honorable Kenneth A. Marra, United States District Judge for the Southern District of
Florida, sitting by designation.

2

ED CARNES, Chief Judge:

In February 2011, the Alabama Education Association (AEA), a public-sector union, and related parties filed a 42 U.S.C. § 1983 lawsuit challenging the constitutionality of Alabama Act No. 2010-761 (codified at Ala. Code § 17-17-5) (Act 761). Act 761 "prohibit[s] a state or local government employee from arranging by payroll deduction or otherwise the payment of any contribution to an organization that uses any portion of those contributions for political activity." Ala. Educ. Ass'n v. State Superintendent of Educ., 665 F.3d 1234, 1235 (11th Cir. 2011) (AEA I) (quotation marks omitted). That prohibition alone, we have previously decided in another appeal involving this same lawsuit, is not a violation of the First Amendment. Id. at 1237; see Ysursa v. Pocatello Educ. Ass'n, 555 U.S. 353, 355, 129 S. Ct. 1093, 1096 (2009). And we have also already decided that Act 761, as interpreted by the Alabama Supreme Court, is not unconstitutionally overbroad or impermissibly vague. Ala. Educ. Ass'n v. State Superintendent of Educ., 746 F.3d 1135, 1139–40 (11th Cir. 2014) (AEA II).

This appeal stems from another claim that AEA brought against Act 761, which is that it violates the First Amendment rights of AEA and its members because the subjective motivations of the lawmakers in passing the Act was to retaliate against AEA for its political speech on education policy. The specific issues before us arise from AEA's pursuit of that claim through subpoenas seeking

3

files of the Alabama Senate President Pro Tempore, the Speaker of the Alabama House of Representatives, the current Governor of Alabama, and the former governor. (For convenience, we will refer to those four collectively as "the four lawmakers" even though two of them are or were governors.)

Before us now are the lawmakers' petitions for writs of mandamus and their appeals, all challenging the district court's refusal to quash AEA's subpoenas. We have two questions to answer: Do we have jurisdiction to hear the appeals? And, if so, did the district court abuse its discretion in refusing to quash AEA's subpoenas? Our answers are yes, and yes.

## I. Background and Procedural History

For several decades Alabama law facilitated public-sector unions' collection of membership dues by authorizing the use of government resources to deduct those dues from the paychecks of state and local government employees who permitted it. See, e.g., Ala. Code § 16-22-6(a); id. § 36-1-4.3. Under state law at the time there was no restriction on the purpose for which those withheld membership dues could be used by the unions. See id.

That changed in the wake of the November 2010 election when the Republicans captured both houses of the Alabama legislature for the first time since Reconstruction. The next month outgoing Republican Governor Bob Riley called a special session of the newly elected legislature to consider an ethics reform

4

package.  That special session produced Act 761.  See Ala. Code § 17-17-5.  Act 761 changed the State's previous payroll deduction policies by prohibiting state and local public-sector employees from arranging, "by salary deduction or otherwise," for:  (1) payments of dues to a membership organization that "uses any portion of the dues for political activity," or (2) payments to a political action committee.[1]  Id. § 17-17-5(b)(1).  As a result, public-sector unions like AEA were forced to choose between using state payroll deduction procedures to collect their membership dues and using their membership dues to fund political activity.[2]

In an attempt to avoid having to make that choice, AEA filed its § 1983 lawsuit before Act 761 went into effect, challenging the Act as unconstitutional on several grounds.  The named plaintiffs are AEA, A-VOTE (the political action committee associated with AEA), and six AEA members.  (For brevity's sake, we are referring to them collectively as "AEA.")

---

[1] Subsection (b)(2) provides that the only way an organization can collect funds or dues from state or local public-sector employees is to certify that the payments will not be used for "political activity" and then submit evidence of its expenditures demonstrating that the payments were not used for "political activity."  Ala. Code § 17-17-5(b)(2).

[2] AEA represents "professional educators and education support personnel employed by the State of Alabama, the Department of Postsecondary Education ('DPE'), Alabama four-year colleges and universities, postsecondary institutions (two-year colleges and trade and vocational training schools) that function under the supervision of the DPE, and local boards of education." Ala. Educ. Ass'n v. Bentley, 788 F. Supp. 2d 1283, 1291 (N.D. Ala. 2011). That is why it had benefitted so much from the pre-Act 761 payroll deduction law and policies.  See, e.g., Ala. Code § 16-22-6(a).

The complaint asserted that Act 761 violated AEA's constitutional rights to due process, equal protection, freedom of speech, and freedom of association. It named as defendants several state government officials in charge of enforcing Act 761, including current Governor Robert Bentley, the Alabama Comptroller, and the Alabama Finance Director. AEA sought a declaratory judgment that the Act was unconstitutional, an injunction barring implementation and enforcement of the Act, as well as attorney's fees and costs.

The district court granted a preliminary injunction in March 2011 barring enforcement of Act 761. Ala. Educ. Ass'n v. Bentley, 788 F. Supp. 2d 1283, 1328 (N.D. Ala. 2011). The court did so based on AEA's claim that the Act was vague and overbroad in violation of the First Amendment. Id. at 1310–28. The defendants appealed, and a different panel of this Court (1) narrowed the scope of the injunction to permit enforcement of the Act in a manner consistent with the restriction on payroll deductions that was approved by the Supreme Court in Ysursa, and (2) certified two questions to the Supreme Court of Alabama about the scope of Act 761. AEA I, 665 F.3d at 1237–39.

After the Supreme Court of Alabama answered the certified questions, see Superintendent of Educ. v. Ala. Educ. Ass'n, 144 So. 3d 265, 278 (Ala. 2013), this Court held that Act 761 was neither overbroad nor void for vagueness, reversed the district court's order granting the preliminary injunction, and remanded the case

6

for further proceedings consistent with its opinion, AEA II, 746 F.3d at 1140.  That opinion was issued in February 2014.

Meanwhile, back in April 2012, the district court had entered an order allowing AEA to proceed with discovery on the claims that were not the basis for the preliminary injunction and, as a result, were not involved in the pending appeal.[3]  In June 2012, the defendants moved to dismiss all of those remaining claims.

That same month, AEA served the subpoenas that led to these appeals. Those subpoenas went to, among others, Governor Bentley, former Governor Bob Riley, Alabama House of Representatives Speaker Mike Hubbard, and Alabama Senate Pro Tempore Del Marsh.  The subpoenas sought production of six categories of documents relating to:  the contents and passage of Act 761, any similar proposals to stop payroll deductions and collection of dues for employee organizations, as well as any communications regarding AEA and the other plaintiffs in the lawsuit.[4]  The three who received subpoenas who were not

---

[3] The district court concluded that it still had jurisdiction over those other claims because a notice of appeal does not divest a district court of jurisdiction over "collateral matters not affecting the questions presented on appeal," and the other claims were "separate and distinct" from the vagueness and overbreadth claims that were at issue in the interlocutory appeal.  See Weaver v. Fla. Power & Light Co., 172 F.3d 771, 773 (11th Cir. 1999).

[4] The subpoenas requested the following six categories of documents:

(1)    All documents explaining the requirements of Act 761, including any cover letters showing who sent such documents;

7

defendants in the lawsuit — former Governor Riley, Representative Hubbard, and Senator Marsh — promptly filed motions to quash the subpoenas, claiming various governmental privileges, including their legislative privileges. The district court held those motions in abeyance and stayed discovery pending its ruling on the defendants' motions to dismiss.

In August 2012, the district court granted the defendants' motions to dismiss AEA's claims that were based on equal protection, viewpoint discrimination, and unconstitutional condition theories. It also dismissed Governor Bentley as a party to the lawsuit after AEA conceded that he was not a proper defendant.

---

(2)    All drafts or proposals of any legislative bill, proposed rule, or proposed regulation to prohibit payroll deductions of dues or contributions to AEA or other organizations composed primarily of state or local government employees, or any political action committees associated with such organizations;

(3)    All communications (including emails) sent or received that related to or concerned the bill that became Act 761 in the December 2010 special session;

(4)    All documents and communications (including emails) from either 2009 or 2010 that "related to or concerned" AEA, A-VOTE, the Alabama State Employees Association, SEA-PAC, Dr. Paul Hubbert, Dr. Joe Reed, or Edwin "Mac" McArthur;

(5)    All documents and communications (including emails) received from the office of Governor Riley, the Comptroller, or the Finance Director that related to or concerned any proposal to stop payroll deductions that collect dues for membership organizations through payroll deductions; and

(6)    All documents and communications (including emails) received from the office of Governor Riley, the Comptroller, or the Finance Director that related to or concerned any proposal to stop contributions to political organizations through payroll deductions.

Only one of AEA's claims survived against the remaining defendants and it was one that was not explicitly stated in the complaint. The surviving claim asserted that Act 761 was an unconstitutional act of governmental retaliation against AEA for its past acts of political expression.[5] Under this retaliation theory, AEA claimed that Act 761 was an act of political retribution against AEA for its past opposition to education policy proposals by Governor Riley and other Alabama Republicans. The district court concluded that this was a viable enough claim to proceed past the motion to dismiss stage in light of our decision in Georgia Association of Educators v. Gwinnett County School District, 856 F.2d 142, 144–45 (11th Cir. 1988).

The Gwinnett County decision does not specify what plaintiffs must prove to establish that an elimination of automatic payroll deductions amounts to unconstitutional retaliation. See id. In its reasoning, the district court filled that gap by borrowing from two of our decisions involving retaliation claims brought by students against state educational institutions. See Castle v. Appalachian Tech. Coll., 631 F.3d 1194, 1197 (11th Cir. 2011) (outlining the elements of a First Amendment retaliation claim in assessing a nursing student's claim that she was suspended for reporting one of her supervisors for falsifying attendance records);

---

[5] There is no express retaliation claim in AEA's complaint. The words "retaliation" and "motivation" do not appear anywhere in the complaint itself. AEA asserted the theory in the briefing on the motions to dismiss, pointing to factual allegations in the complaint that could arguably be read as supporting such a claim.

9

Keeton v. Anderson–Wiley, 664 F.3d 865, 877–78 (11th Cir. 2011) (doing the same in assessing a graduate student's claim she was subjected to a "remediation plan" after she expressed her personal religious beliefs). The court concluded that AEA had to establish all of the following: (1) its speech was constitutionally protected; (2) the elimination of payroll deductions would likely deter persons of ordinary firmness from engaging in such speech; (3) there was a causal relationship between Act 761 and AEA's past political expression; and (4) the lawmakers who passed Act 761 were "subjectively motivated" by AEA's political expression. The defendants filed a motion asking the district court to certify an interlocutory appeal of the issue of whether the complaint did state a viable claim for relief on a First Amendment violation based on a retaliation theory, see 28 U.S.C. § 1292(b), but the district court declined to do so.

In August 2012, Governor Bentley, who was no longer a party in the lawsuit, filed a motion to quash the subpoena directed to him. Like the other three lawmakers who had filed motions to quash, Governor Bentley asserted that various governmental privileges, including his legislative privilege, exempted him from having to respond the subpoena.

In January 2013, the district court denied all four lawmakers' motions to quash. The court's order extensively discussed the various privileges asserted by the four lawmakers, but it based its ruling on what it believed to be the lawmakers'

10

failure to properly assert those privileges. The court relied on a Third Circuit decision to conclude that there were four requirements for invoking the privileges that the lawmakers had asserted. See United States v. O'Neill, 619 F.2d 222, 226 (3d Cir. 1980). The court ruled that all of the lawmakers had failed to meet any of the four requirements for asserting any of the privileges they had asserted. It ordered each of them to "provide full and complete responses to the subpoenas" by February 1, 2013.

The lawmakers then sought review by this Court, filing petitions for writs of mandamus, see 28 U.S.C. § 1651, and appeals under 28 U.S.C. § 1291. We issued an order that: (1) consolidated into a single appeal all of the mandamus petitions and appeals, and (2) stayed the district court's production order pending our decision. In the meantime, AEA has received documents the lawmakers do not contend are privileged but none of the documents that they contend are privileged.

## II. Appellate Jurisdiction

The lawmakers filed their appeals under 28 U.S.C. § 1291, which grants us "jurisdiction of appeals from all final decisions of the district courts of the United States." A "final decision" is usually a final judgment or similar order "by which a district court disassociates itself from a case." Swint v. Chambers Cnty. Comm'n, 514 U.S. 35, 42, 115 S. Ct. 1203, 1208 (1995). The collateral order doctrine, however, recognizes "a small category of decisions that, although they do not end

11

the litigation, must nonetheless be considered 'final.'" Id. (quoting Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S. Ct. 1221, 1225–26 (1949)).

It is the law of this circuit that one who unsuccessfully asserts a governmental privilege may immediately appeal a discovery order where he is not a party to the lawsuit. Branch v. Phillips Petroleum Co., 638 F.2d 873, 879 (5th Cir. Unit A March 5, 1981)[6] (holding, in a case in which the government was not a party, that circuit precedent "extends the right of immediate appeal to the government even when it is itself in custody of the subpoenaed material"); Cates v. LTV Aerospace Corp., 480 F.2d 620, 622 (5th Cir. 1973) ("[D]iscovery orders may be appealable when an executive privilege is involved and the executive or governmental agency is not a party to the lawsuit."); Carr v. Monroe Mfg. Co., 431 F.2d 384, 387 (5th Cir. 1970) ("[D]iscovery orders may be appealable where a governmental privilege is asserted and the government is not a party to the suit."). Our precedent is clear that government officials may appeal from the discovery order itself without waiting for contempt proceedings to be brought against them. See Branch, 638 F.2d at 878–79.

The four lawmakers who have moved to quash the subpoenas are all present or former government officials whom the district court has ordered to produce

---

[6] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

12

documents in spite of their assertion of various governmental privileges.  None of the four lawmakers is a party to the lawsuit and neither are their agencies or the State of Alabama itself.  Under our circuit precedent, they may immediately appeal the district court's discovery order.

AEA argues that our precedent should be read as permitting "a pre-contempt appeal only where it is the government itself that claims the privilege."  That position cannot be squared with our Cates decision, which held that executive officials — not just government entities — may immediately appeal a discovery order denying a claim of executive privilege.  See Cates, 480 F.2d at 622 (holding that "discovery orders may be appealable when an executive privilege is involved and the executive or governmental agency is not a party to the lawsuit").  Since a government official can immediately appeal the rejection of a claim of executive privilege without the government itself being a party, it would be inconsistent to hold that a government official cannot immediately appeal the rejection of a claim of legislative privilege unless the government is a party.  No difference between executive and legislative privilege would justify that inconsistency.

Recognizing the problem its position faces, AEA argues that our prior precedent permitting government officials to immediately appeal the denial of motions to quash based on assertions of governmental privilege has been overruled by the Supreme Court's decision in Mohawk Industries, Inc. v. Carpenter, 558 U.S.

13

100, 130 S. Ct. 599 (2009).[7] That decision held that "the collateral order doctrine does not extend to disclosure orders adverse to the attorney–client privilege." Id. at 114, 130 S. Ct. at 609. It said nothing about the kind of governmental privileges asserted here or any governmental privilege for that matter. Nor did it alter the scope of the collateral order doctrine. Mohawk is not the kind of "clearly on point" Supreme Court precedent that is required to overrule our prior panel precedent. See Garrett v. Univ. of Ala. at Birmingham Bd. of Trustees, 344 F.3d 1288, 1292 (11th Cir. 2003); see also Branch, 638 F.2d at 878–79 (holding that our decisions allowing government officials to seek immediate appeal of discovery orders were still viable after a Supreme Court decision holding that private individuals cannot seek immediate appeal from discovery orders compelling the production of documents). We must follow our precedent "unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by

---

[7] AEA buttresses its argument by citing the Seventh Circuit's decision in Ott v. City of Milwaukee, 682 F.3d 552, 553–55 (7th Cir. 2012), which applied Mohawk and held that non-party state agencies cannot immediately appeal a discovery order and instead must appeal from a contempt citation. We are obviously bound to follow our own precedent instead of Seventh Circuit case law. See OSI, Inc. v. United States, 285 F.3d 947, 952 n.3 (11th Cir. 2002). And, in any event, Ott is distinguishable. It arose from an exonerated man's § 1983 lawsuit bringing wrongful conviction and incarceration claims against several Milwaukee police officers and the City of Milwaukee. 682 F.3d at 554. The subpoenas at issue were served on the Wisconsin Crime Laboratory and the Wisconsin Department of Corrections to obtain documents related to the DNA testing of the plaintiff. Id. The Seventh Circuit noted that there was "no risk of an unwarranted intrusion on state sovereignty" in requiring the state agencies to risk contempt citations because they "were acting as the agents of the City's Police Department, and [the plaintiff's] suit against the City and its officers [fell] comfortably within federal authority." Id. at 555. That is not what we have here. The four lawmakers never acted as the agents of the various state, county, and city officials named as defendants in AEA's lawsuit. Nor does AEA's lawsuit fall "comfortably within federal authority." See infra Part III.B–C.

14

this court sitting <u>en</u> <u>banc</u>." <u>United States v. Archer</u>, 531 F.3d 1347, 1352 (11th Cir.

2008); <u>United States v. Chubbuck</u>, 252 F.3d 1300, 1305 n.7 (11th Cir. 2001) ("We

are not at liberty to disregard binding case law that is so closely on point and has

been only weakened, rather than directly overruled, by the Supreme Court.")

(quotation marks omitted); <u>NLRB v. Datapoint Corp.</u>, 642 F.2d 123, 129 (5th Cir.

Unit A April 8, 1981) ("Without a clearly contrary opinion of the Supreme Court

or of this court sitting en banc, we cannot overrule a decision of a prior panel of

this court . . . ."). Neither <u>Cates</u>, nor <u>Branch</u>, nor <u>Carr</u> has been overruled or

undermined to the point of abrogation by a Supreme Court decision.

For these reasons, we have jurisdiction to review the denial of the motions to

quash the subpoenas.[8]

### III. The Merits of the Appeals

Now for the merits of the appeals. Under Federal Rule of Civil Procedure

45, a district court "must quash or modify a subpoena that . . . requires disclosure

of privileged or other protected matter." Fed. R. Civ. P. 45(d)(3)(A)(iii).[9] The

---

[8] The Supreme Court recognized in <u>Mohawk</u> that mandamus may lie to review a district court's "disclosure order [that] amounts to a judicial usurpation of power or a clear abuse of discretion or otherwise works a manifest injustice." 558 U.S. at 607, 130 S. Ct. at 111 (alteration omitted); <u>see also</u> <u>id.</u> at 608, 130 S. Ct. at 112. Given our holding that we have jurisdiction under § 1291, we need not decide whether this is one of those extraordinary circumstances where mandamus would lie.

[9] The district court ruled on the lawmakers' motions to quash before the latest amendments to the Federal Rules of Civil Procedure took effect on December 1, 2013. The amendments did not

15

federal courts have the authority and duty to recognize claims of privilege that are valid under federal common law.  Fed. R. Evid. 501.  To assert a privilege claim, a person "must:  (i) expressly make the claim; and (ii) describe the nature of the withheld documents . . . in a manner that . . . will enable the parties to assess the claim."  Fed. R. Civ. P. 45(e)(2)(A).  We review a district court's decision on whether to quash a subpoena only for an abuse of discretion.  See Ariel v. Jones, 693 F.2d 1058, 1060 (11th Cir. 1982).  A ruling based on an error of law or one that reflects a clear error of judgment is an abuse of discretion.  See FTC v. Nat'l Urological Grp., Inc., 785 F.3d 477, 481 (11th Cir. 2015) (explaining that a district court abuses its discretion when it "applies an incorrect legal standard, [or] applies the law in an unreasonable or incorrect manner") (quotation marks omitted); Ameritas Variable Life Ins. Co. v. Roach, 411 F.3d 1328, 1330 (11th Cir. 2005) ("[W]e will leave undisturbed a district court's ruling unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard."); SunAmerica Corp. v. Sun Life Assurance Co. of Canada, 77 F.3d 1325, 1333 (11th Cir. 1996) (holding that committing a "clear error of judgment" or applying "an incorrect legal standard" is an abuse of discretion).

---

change the substance of any of the provisions from Rule 45 that apply here, only the numbering of those provisions.  To avoid confusion for future readers, we will use the post-2013 numbering.

While each of the four lawmakers asserted multiple privileges as grounds for quashing the AEA subpoena directed to him, we need address only the legislative privilege, which all of them raised.  They argued that the only purpose of AEA's subpoenas was to uncover evidence of their motivations for passing Act 761 and that the legislative privilege shields them from such inquiries.

The legislative privilege is important.  It has deep roots in federal common law.  See Tenney v. Brandhove, 341 U.S. 367, 372, 71 S. Ct. 783, 786 (1951) (recognizing "[t]he privilege of legislators to be free from arrest or civil process for what they do or say in legislative proceedings"); see also United States v. Gillock, 445 U.S. 360, 372 n.10, 100 S. Ct. 1185, 1193 n.10 (1980) (noting that Tenney "was grounded on its interpretation of federal common law").  The privilege protects the legislative process itself, and therefore covers both governors' and legislators' actions in the proposal, formulation, and passage of legislation.  See Tenney, 341 U.S. at 372, 376, 71 S. Ct. at 786, 788 (recognizing a legislative privilege for state legislators when acting "in the sphere of legitimate legislative activity"); Reeder v. Madigan, 780 F.3d 799, 800, 805 (7th Cir. 2015) (affirming the legislative privilege of state representatives and senators); see also Women's Emergency Network v. Bush, 323 F.3d 937, 950 (11th Cir. 2003) (holding that Florida's governor was protected by legislative immunity when signing a bill into law); Baraka v. McGreevey, 481 F.3d 187, 196–97 (3d Cir. 2007) (holding that a

17

governor falls within the sphere of legislative activity when "advocating and promoting legislation"). And it does not matter to the existence of the legislative privilege that the four lawmakers were not parties to AEA's lawsuit. The privilege "applies whether or not the legislators themselves have been sued." EEOC v. Wash. Suburban Sanitary Comm'n, 631 F.3d 174, 181 (4th Cir. 2011); see MINPECO, S.A. v. Conticommodity Servs., Inc., 844 F.2d 856, 859 (D.C. Cir. 1988).

The district court did not rule that a validly asserted legislative privilege would not provide a defense against the production of subpoenaed documents. Instead, the court ruled that the lawmakers had forfeited their privileges, including their legislative privileges, by failing to properly assert them. In reaching that ruling, the district court relied heavily on a Third Circuit decision that imposed four requirements for assertion of claims of governmental privilege. See United States v. O'Neill, 619 F.2d 222, 226 (3d Cir. 1980). According to that decision, those four requirements are: (1) the government official invoking the privilege "must personally review the material," (2) the official must provide "a specific designation and description of the documents claimed to be privileged," (3) the official must provide "precise and certain reasons for preserving" the confidentiality of the documents, and (4) the claim usually "must be raised by affidavit." See id. at 226 (quotation marks omitted). The district court concluded

18

that, because the four lawmakers had not met any of the four requirements announced in that Third Circuit decision, they had failed to properly assert their legislative privileges against AEA's subpoenas and had thereby lost the right to assert them.

That was an error of law, and therefore an abuse of discretion, because none of those four requirements provides a proper basis for denying the kind of legislative privilege claims raised in the circumstances that exist in this case. See Nat'l Urological Grp., 785 F.3d at 481. Two of the requirements are contrary to this circuit's precedent, and the other two are inappropriate given the circumstances.

## A.

Denying the lawmakers' legislative privilege claims based on the first and fourth prerequisites — that the lawmakers personally review the documents and raise their claims by affidavit — violates this Court's precedent. The Branch decision expressly held that such formal technicalities are not a proper basis for denying an otherwise proper claim of governmental privilege if the grounds for assertion of the privilege are adequately presented to the district court, 638 F.2d at 882–83, as they were here.

In Branch a Title VII defendant subpoenaed documents from the EEOC's Houston district office, and the director of that office refused to produce them on

19

the ground that they were protected by an "'executive' or 'official information' privilege." Id. at 876–77, 879.  In the appeal from the district court's order compelling production of the documents, the defendant company argued that the EEOC "ha[d] not properly invoked the privilege." Id. at 882.  Its position relied on the Supreme Court's statement in United States v. Reynolds that, in order to properly invoke a governmental privilege, "'[t]here must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration [by] that officer.'" Branch, 638 F.2d at 882 (quoting Reynolds, 345 U.S. 1, 7–8, 73 S. Ct. 528, 532 (1953)).

The Branch court explained that the purpose of such procedural prerequisites is simply "to insure that subordinate officials do not lightly or mistakenly invoke the government's privilege in circumstances not warranting its application," and it held that so long as there is "sufficient compliance" to satisfy that goal, the privilege should be honored. Id. at 882–83.  In Branch, it was enough that the director of the Houston office:  (1) consulted with the office of the General Counsel at the EEOC, and (2) "made the [EEOC's] objections to disclosure and its basis for them known to the court in written responses to questions accompanying the subpoena itself." Id. at 883.

Here, the four lawmakers' motions to quash were sufficiently compliant with Reynolds to invoke the legislative privilege.  They are, after all, the Governor of

20

Alabama, the former governor, the President Pro Tempore of the Alabama Senate, and the Speaker of the Alabama House of Representatives. None of them are "subordinate officials." See Branch, 638 F.2d at 882. They each unquestionably hold their own legislative privilege. See Reeder, 780 F.3d at 805; Women's Emergency Network, 323 F.3d at 950; Baraka, 481 F.3d at 196–97. The four invoked their privileges through their counsel, just as the EEOC had invoked its privilege through the director of its Houston office. See Branch, 638 F.2d at 883. And the lawmakers' counsel made their privilege claims known through written motions to quash, which are akin to the written responses in Branch. See id. No affidavits or confirmations that the lawmakers had personally reviewed the documents were required.

By overlooking the Branch decision, which is binding precedent, and instead following the Third Circuit's O'Neill decision, which is not, the district court inadvertently transgressed the fundamental rule that courts of this circuit are bound by the precedent of this circuit. See Generali v. D'Amico, 766 F.2d 485, 489 (11th Cir. 1985).

**B.**

Denying the lawmakers' legislative privilege claims based on the other two requirements — that the privileged documents be specifically designated and described, and that precise and certain reasons for preserving confidentiality be

21

given — was also an error of law. Rule 45 requires only enough description and precision to "enable the parties to assess the claim." Fed. R. Civ. P. 45(e)(2)(A)(ii). Given the purpose of the legislative privilege, the nature of AEA's only remaining legal claim, and the sole purpose of the subpoena in light of that claim, there was more than enough under Rule 45 to assess the claim of privilege and to compel the granting of the motions to quash.[10]

The legislative privilege "protects against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts." United States v. Brewster, 408 U.S. 501, 525, 92 S. Ct. 2531, 2544 (1972) (emphasis added);[11] see Tenney, 341 U.S. at 377, 71 S. Ct. at 788 (declaring "that it [i]s not consonant with our scheme of government for a court to inquire into the motives of legislators"). One of the privilege's principle purposes is to ensure that lawmakers are allowed to "focus on their public duties." Wash. Suburban Sanitary

---

[10] This case is materially distinguishable from the one that produced the Third Circuit's O'Neill decision. The privilege at issue in that case was a vaguely asserted "qualified executive or governmental privilege," not a legislative privilege. See O'Neill, 619 F.2d at 228. And the disputed subpoenas were meant to provide evidence for an investigation by the United States Commission on Civil Rights into allegations of police brutality by the city's police officers. See id. at 224–25. An official federal investigation into potential abuses of federal civil rights is a far cry from a private lawsuit attacking a facially valid state statute by attempting to discover the subjective motivations of some of the legislative leaders and the governor who supported it.

[11] Though Brewster involved a former United States Senator's claim of legislative privilege under the Speech or Debate Clause, see 408 U.S. at 502, 507–08, 92 S. Ct. at 2532, 2535, it is well-established that state lawmakers possess a legislative privilege that is "similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause," Supreme Court of Va. v. Consumers Union of U.S., Inc., 446 U.S. 719, 732, 100 S. Ct. 1967, 1974 (1980).

22

Comm'n, 631 F.3d at 181; cf. Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 503, 95 S. Ct. 1813, 1821 (1975) (explaining that the Speech or Debate Clause ensures that civil litigation will not "create[] a distraction and force[] Members to divert their time, energy, and attention from their legislative tasks to defend the litigation"). That is why the privilege extends to discovery requests, even when the lawmaker is not a named party in the suit: complying with such requests detracts from the performance of official duties. See Wash. Suburban Sanitary Comm'n, 631 F.3d at 181; MINPECO, 844 F.2d at 859 ("A litigant does not have to name members or their staffs as parties to a suit in order to distract them from their legislative work. Discovery procedures can prove just as intrusive."). The privilege applies with full force against requests for information about the motives for legislative votes and legislative enactments.

And — this is important — that was the only purpose left for the subpoenas when the district court denied the motion to quash. Their sole reason for existing was to probe the subjective motivation of the legislators who supported Act 761. All of AEA's claims had been dismissed, except the retaliation claim. See supra Part I. The core of a First Amendment retaliation claim, its factual heart, is the subjective motivation to retaliate. See supra Part I (describing how the district court's order required the plaintiffs to establish that the lawmakers who passed Act 761 were "subjectively motivated" by political retribution); see also Walker v.

23

Schwalbe, 112 F.3d 1127, 1133 (11th Cir. 1997) (explaining that "[t]he government official's state of mind" is an essential element of a First Amendment retaliation claim). So at the time the district court ruled on the motions to quash, AEA's lawsuit was by definition an "inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts." See Brewster, 408 U.S. at 525, 92 S. Ct at 2544 (emphasis added). The subpoenas' only purpose was to support the lawsuit's inquiry into the motivation behind Act 761, an inquiry that strikes at the heart of the legislative privilege. See id.; see also Brown & Williamson Tobacco Corp. v. Williams, 62 F.3d 408, 416 (D.C. Cir. 1995) (explaining that the privilege applies "when the action complained of falls within the legislative sphere").

To put it another way, the factual heart of the retaliation claim and the scope of the legislative privilege were one and the same: the subjective motivation of those acting in a legislative capacity. Any material, documents, or information that did not go to legislative motive was irrelevant to the retaliation claim, while any that did go to legislative motive was covered by the legislative privilege. That was not the case in the Third Circuit's O'Neill decision. See supra note 10. Some of the relevant information sought by the subpoenas in the O'Neill case could have been outside of any asserted privilege. None of the relevant information sought in this case could have been outside of the legislative privilege.

24

Because the only remaining claim in AEA's lawsuit struck at the heart of the legislative privilege, and none of the information sought could have been outside the privilege, there was no need for the lawmakers to peruse the subpoenaed documents, to specifically designate and describe which documents were covered by the legislative privilege, or to explain why the privilege applied to those documents. See Fed. R. Civ. P. 45(e)(2)(A)(ii) (requiring only that the privilege claim contain enough detail to "enable the parties to assess the claim"). It was enough to point out, as the lawmakers did, that the only purpose of the subpoenas was to further AEA's inquiry into the lawmakers' motivations for Act 761 and that their legislative privileges exempted them from such inquiries. Cf. Brown & Willamson Tobacco Corp., 62 F.3d at 419 (explaining that, in cases where nonparty lawmakers moved to quash subpoenas based on legislative privilege, "the only question was whether the subpoenas inquired into legislative conduct"). To insist on unnecessary detail and procedures, as the district court did, would undermine a primary purpose of the legislative privilege — shielding lawmakers from the distraction created by inquiries into the regular course of the legislative process. See Brewster, 408 U.S. at 525, 92 S. Ct. at 2544; Wash. Suburban Sanitary Comm'n, 631 F.3d at 181; MINPECO, 844 F.2d at 859. Given the

25

circumstances here, the lawmakers' motions to quash were sufficient to invoke their legislative privileges.[12]

We need not decide in this case whether a document-by-document invocation of the legislative privilege would be required in a different case, one where the documents are requested to support a claim that is not at its core and in its entirety an inquiry into the subjective motivation that lawmakers had in passing legislation.

## C.

AEA argues that, even if the four lawmakers did properly assert their legislative privileges here, and even if those privileges would otherwise apply, they must yield to AEA's interest in vindicating its First Amendment rights.  To be sure, a state lawmaker's legislative privilege must yield in some circumstances where necessary to vindicate important federal interests such as "the enforcement of federal criminal statutes."  Gillock, 445 U.S. at 373, 100 S. Ct. at 1193.  But the Supreme Court has explained that, for purposes of the legislative privilege, there is a fundamental difference between civil actions by private plaintiffs and criminal

---

[12] What we have said in this Part applies as well to the district court's ruling that the lawmakers were required to personally review the documents and raise their privilege claims by affidavit.  See supra Part III.A.  Lawmakers do not need to personally review any documents or sign affidavits to "enable the parties to assess the claim[s]," Fed. R. Civ. P. 45(e)(2)(A)(ii), where the subpoena necessarily trenches upon the interests protected by the legislative privilege.  The nature of AEA's sole remaining claim defines the purpose of the subpoenas, which in turn answers the question of whether the privilege applies.

26

prosecutions by the federal government.  See id. at 372–73, 100 S. Ct. at 1193 ("[I]n protecting the independence of state legislators, Tenney and subsequent cases on official immunity have drawn the line at civil actions."). This is not a federal criminal investigation or prosecution.

AEA's subpoenas do not serve an important federal interest.  Don't misunderstand us.  We are not saying that enforcing the First Amendment is not an important federal interest or that it does not protect important constitutional values. Obviously it is and does.  What we are saying is that, as a matter of law, the First Amendment does not support the kind of claim AEA makes here:  a challenge to an otherwise constitutional statute based on the subjective motivations of the lawmakers who passed it.[13]  And because the specific claim asserted does not legitimately further an important federal interest in this context, the legislative privileges must be honored and the subpoenas quashed.

### 1.

In United States v. O'Brien, the Supreme Court held that, as a "principle of constitutional law," courts cannot "strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."  391 U.S. 367, 383, 88 S. Ct. 1673, 1682 (1968).  The plaintiff in O'Brien had challenged a congressional statute

---

[13] Our decision should not be read as deciding whether, and to what extent, the legislative privilege would apply to a subpoena in a private civil action based on a different kind of constitutional claim than the one AEA made here.  We address only the issues that are before us.

27

on free-speech grounds by citing from the legislative history statements of three Congressmen and then using those statements to argue that "the 'purpose' of Congress" in passing the statute "was 'to suppress freedom of speech.'"  See id. at 382–83, 385–86, 88 S. Ct. at 1682, 1683–84.  The Supreme Court rejected the challenge outright, citing the "fundamental principle of constitutional adjudication" that courts may not "void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it."[14]  Id. at 383–84, 88 S. Ct. at 1682–83.  See also Arizona v. California, 283 U.S. 423, 455, 51 S. Ct. 522, 526 (1931) ("Into the motives which induced members of Congress to enact the [statute], this court may not inquire.").

This Court's precedent applying O'Brien recognizes that, when a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose.  We have held that many times.  See, e.g., Artistic Entm't, Inc. v. City of Warner Robins, 223 F.3d 1306, 1309 (11th Cir. 2000) (stating that, in a free-speech challenge to a city ordinance, courts "will 'not strike down an otherwise constitutional statute on the basis of an alleged legislative illicit motive.'")

---

[14] O'Brien acknowledged that there are limitations to this rule.  See 391 U.S. at 383 n.30, 88 S. Ct. at 1682 n.30 (noting that "an inquiry into the legislative purpose" is permissible where a law is challenged as a bill of attainder, as an ex post facto law, or on another ground that requires the court to determine whether the challenged statute is "penal in nature").  Our discussion of the O'Brien rule is limited to the context before us:  a free-speech retaliation challenge to an otherwise constitutional statute.

(quoting O'Brien, 391 U.S. at 383, 88 S. Ct. at 1682); Int'l Food & Beverage Sys. v. City of Fort Lauderdale, 794 F.2d 1520, 1525 (11th Cir. 1986) (explaining, while rejecting a free-speech challenge to a city ordinance, that "United States v. O'Brien teaches against striking down otherwise constitutional legislation on the basis of a speculated illicit legislative motive.") (citation omitted).

The O'Brien rule applies here because Act 761 does not, on its face, impinge on any constitutional rights.  As this Court has already held, Act 761 "only declines to promote speech, rather than abridging it," and therefore "does not implicate any constitutionally protected conduct."  AEA II, 746 F.3d at 1139.  So the statute is facially constitutional.  The only basis for AEA's retaliation claim is the alleged retaliatory motive that Alabama's lawmakers had when passing Act 761.  See supra Part I.  That is precisely the challenge that O'Brien, and our decisions following it, foreclose.  See 391 U.S. at 382–86, 88 S. Ct. at 1682–84.

We are not the first circuit to address whether O'Brien applies in this context.  Every other circuit that has addressed the issue has also held that O'Brien bars First Amendment retaliation claims against legislation eliminating state-sponsored collection of union dues through payroll deductions.  See Bailey v. Callaghan, 715 F.3d 956, 960 (6th Cir. 2013) (rejecting a teachers union's First Amendment retaliation claim challenging Michigan's elimination of state-sponsored collection of union dues through payroll deductions); Wis. Educ. Ass'n

29

Council v. Walker, 705 F.3d 640, 649–53 (7th Cir. 2013) (rejecting the First Amendment retaliation claim by several public-sector unions against Wisconsin's elimination of its state-sponsored collection of union dues through payroll deductions); S.C. Educ. Ass'n v. Campbell, 883 F.2d 1251, 1257–59 (4th Cir. 1989) (rejecting a teachers union's First Amendment retaliation claim challenging South Carolina's elimination of its state-sponsored collection of union dues through payroll deductions).  Another circuit has held that O'Brien bars similar retaliation claims against facially constitutional statutes generally.  See Planned Parenthood of Kansas & Mid-Missouri v. Moser, 747 F.3d 814, 820, 840–41 (10th Cir. 2014) (rejecting a local Planned Parenthood chapter's retaliation claim challenging Kansas' elimination of healthcare appropriations that are not for public entities or nonpublic hospitals).  We agree with the Fourth, Sixth, Seventh, and Tenth Circuits.  And, of course, we are bound to follow O'Brien itself.

Because AEA has not presented a cognizable First Amendment claim, there is no "important federal interest[] at stake" in this case to justify intruding upon the lawmakers' legislative privileges.  See Gillock, 445 U.S. at 373.  The lawmakers' motions to quash are therefore due to be granted.

**2.**

The only decision AEA cites to support its position that a First Amendment retaliation claim will support an inquiry into the subjective motives of the

30

legislators who supported enactment of a facially constitutional law is our own Gwinnett County decision. See 856 F.2d at 144–45. And in denying the motion to dismiss this claim, the district court was convinced that the question of whether the First Amendment supports a retaliation claim against an otherwise constitutional statute is "controlled by the binding precedent of the Eleventh Circuit in the Gwinnett County case." That district court ruling itself is not directly before us in this appeal because the court denied the defendants' 28 U.S.C. § 1292(b) motion for certification of the ruling, which would have permitted an interlocutory appeal. See supra Part I.

But, then again, the same issue the district court ruled on in denying the motion to dismiss the claim is indirectly before us because it bears directly on the question of whether there is a strong federal interest that would be impeded by applying the legislative privilege to block the subpoenas. See Gillock, 445 U.S. at 373, 100 S. Ct. at 1193 (explaining that a court must determine whether there is an important federal interest at stake in deciding whether the legislative privilege should be applied). If the O'Brien rule forecloses AEA's First Amendment retaliation claim, then there is no strong federal interest that outweighs the interests behind the legislative privilege. If, on the other hand, Gwinnett County establishes the legal legitimacy of the claim, the question is a different one.

31

What our decision in Gwinnett County means, and whether it is distinguishable, is a question of law that we decide de novo.  See Locke v. Shore, 634 F.3d 1185, 1191 (11th Cir. 2011).  It is distinguishable.  The facts of that case limit the holding of the decision to acts of governmental retaliation that explicitly single out a specific group.  In that case, a school board adopted its superintendent's recommendation to terminate the automatic payroll deduction of membership dues for members of the Georgia Association of Educators (GAE) and its local affiliate, the Gwinnett County Association of Educators (GCAE).  856 F.2d at 143–44.  The recommendation came after the superintendent clashed with the GCAE over its representation of school system employees before the board and its affiliation with the National Education Association.  Id. at 144 & n.1.  The board members admitted that they had terminated the payroll dues deduction services for those reasons.  Id. at 144.  This Court held that — despite the fact that the teachers union had no constitutional right to automatic payroll deduction of membership dues — the county board of education could not deny the union's members the benefit of that service as a "sanction[] for the expression of particular views it opposes."  Id. at 145 (quotation marks omitted).

The crucial fact in Gwinnett County is that the school board did not adopt a generally applicable policy — it specifically singled out "GAE-GCAE members."  856 F.2d 144 ("[T]he superintendent recommended that the Board terminate the

32

dues deduction service for GAE-GCAE members, and the Board voted 4-1 to accept the recommendation.") (footnote omitted).  That fact made O'Brien inapplicable because the O'Brien rule applies only where the law at issue is "constitutional on its face."  391 U.S. at 384, 88 S. Ct. at 1683.  The holding of Gwinnett County therefore does not implicate the O'Brien rule, nor does it extend to cases involving generally applicable laws — such as Act 761 — because "judicial decisions cannot make law beyond the facts of the cases in which those decisions are announced."  Watts v. BellSouth Telecomms., Inc., 316 F.3d 1203, 1207 (11th Cir. 2003); Edwards v. Prime, Inc., 602 F.3d 1276, 1298 (11th Cir. 2010) ("[R]egardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case."); United States v. Aguillard, 217 F.3d 1319, 1321 (11th Cir. 2000) ("The holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision.") (quotation marks omitted).[15]  For these reasons, the O'Brien rule applies here, which means that AEA has no valid federal claim to justify intruding upon the lawmakers' legislative privileges.

---

[15] To interpret Gwinnett County as applying to generally applicable acts would throw it into conflict with the Supreme Court's decision in O'Brien.  Courts of appeal cannot, of course, overrule the Supreme Court. We have an obligation to construe our prior decisions to be consistent with Supreme Court precedent where possible.

33

## IV. Conclusion

For the foregoing reasons, we reverse the district court's denial of the four lawmakers' motions to quash. On remand, the motions to quash must be granted. And all remaining proceedings are to be conducted consistently with this opinion. Because we have resolved this appeal through the lawmakers' appeals under 28 U.S.C. § 1291, we dismiss the petitions for writs of mandamus as moot.

In closing, we note that the district court on remand is not bound to adhere to its earlier order denying the lawmakers' motion to dismiss AEA's First Amendment retaliation claim. The court may revisit its order refusing to dismiss the retaliation claim because it has the authority to revisit any of its orders so long as final judgment has not yet been entered. See Culpepper v. Irwin Mortg. Corp., 491 F.3d 1260, 1271–72 (11th Cir. 2007) (explaining that the law-of-the-case doctrine did not require the district court to adhere to an earlier ruling because, in light of a later circuit decision, the earlier ruling was "clearly erroneous" and following it "would work manifest injustice") (quotation marks omitted); Murphy v. FDIC, 208 F.3d 959, 966 (11th Cir. 2000) (explaining that the law-of-the-case doctrine "does not . . . require rigid adherence to rulings made at an earlier stage of a case in all circumstances"); United States v. Williams, 728 F.2d 1402, 1406 (11th Cir. 1984) ("[A] court's previous rulings may be reconsidered as long as the case remains within the jurisdiction of the district court."); Robinson v. Parrish, 720

34

F.2d 1548, 1549–50 (11th Cir. 1983) (explaining that, under the law-of-the-case doctrine, a district court is not obligated to "rigidly adhere to its own rulings in an earlier stage of a case").  It may wish to do so in light of what we have said about the crucial distinction between Gwinnett County and this case and in light of our discussion in Part III.C. of this opinion.

The order denying the motions to quash the subpoenas is REVERSED, the petitions for writs of mandamus are DISMISSED AS MOOT, and the case is REMANDED to the district court for further proceedings consistent with this opinion.