# United States Court of Appeals
## For the First Circuit
### For the First Circuit

No. 20-2120

AMERICAN TRUCKING ASSOCIATIONS, INC.; CUMBERLAND FARMS, INC.;
M&M TRANSPORT SERVICES, INC.; NEW ENGLAND MOTOR FREIGHT, INC.,

Plaintiffs, Appellees,

v.

PETER ALVITI, JR., in his official capacity as Director of the
Rhode Island Department of Transportation; RHODE ISLAND TURNPIKE
AND BRIDGE AUTHORITY,

Defendants,

GINA M. RAIMONDO, Governor of the State of Rhode Island;
NICHOLAS A. MATTIELLO, Speaker of the Rhode Island House of
Representatives; STEPHEN R. UCCI, Member of the Rhode Island
House of Representatives,

Interested Parties, Appellants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

---

No. 20-2168

In re: GINA M. RAIMONDO, Governor of the State of Rhode Island;
NICHOLAS MATTIELLO, Speaker of the Rhode Island House of
Representatives; STEPHEN R. UCCI, Member of the Rhode Island
House of Representatives; PETER ALVITI, in his official capacity
as Director of the Rhode Island Department of Transportation;
and RHODE ISLAND TURNPIKE AND BRIDGE AUTHORITY,

Petitioners.

---

PETITION FOR A WRIT OF MANDAMUS

Before

Thompson and Kayatta, <u>Circuit Judges</u>,
and Woodlock, <u>District Judge</u>.*

 <u>Nicole J. Benjamin</u>, with whom <u>John A. Tarantino</u>, <u>Patricia K.</u>
<u>Rocha</u>, <u>R. Bart Totten</u>, <u>Adler Pollock & Sheehan P.C.</u>, <u>Michael W.</u>
<u>Field</u>, <u>Keith David Hoffman</u>, and <u>R.I. Office of Attorney General</u>
were on brief, for appellants.
 <u>Nicole J. Benjamin</u>, with whom <u>John A. Tarantino</u>, <u>Patricia K.</u>
<u>Rocha</u>, <u>R. Bart Totten</u>, <u>Adler Pollock & Sheehan P.C.</u>, <u>Michael W.</u>
<u>Field</u>, <u>Keith David Hoffman</u>, and <u>R.I. Office of Attorney General</u>,
were on brief, for <u>Rhode Island Senate</u>, amicus curiae.
 <u>Charles A. Rothfeld</u>, with whom <u>Evan M. Tager</u>, <u>Reginald R.</u>
<u>Goeke</u>, <u>Colleen M. Campbell</u>, <u>Mayer Brown LLP</u>, <u>Richard Pianka</u>, and
<u>ATA Litigation Center</u> were on brief, for appellees.
 <u>Nicole J. Benjamin</u>, with whom <u>John A. Tarantino</u>, <u>Patricia K.</u>
<u>Rocha</u>, <u>R. Bart Totten</u>, <u>Adler Pollock & Sheehan P.C.</u>, <u>Michael W.</u>
<u>Field</u>, <u>Keith David Hoffman</u>, and <u>R.I. Office of Attorney General</u>
were on brief, for petitioners.

September 21, 2021

---

 * Of the District of Massachusetts, sitting by designation.

**KAYATTA, <u>Circuit Judge</u>.** We consider in these consolidated cases an interlocutory appeal and a petition for mandamus, each asking that we reverse a decision of the district court refusing to quash subpoenas seeking discovery from Rhode Island public officials and a state consultant.[1] The proponents of the discovery are trucking interests who assert that the discovery is reasonably calculated to provide evidence that Rhode Island elected officials aimed to discriminate against interstate commerce in charging bridge tolls. The targets of the proposed discovery assert that principles of legislative privilege preclude the discovery. We decline the request to allow an interlocutory appeal of the district court's order. We also decline to issue a writ of mandamus regarding the district court's refusal to quash the discovery subpoenas served on the state's consultant, CDM Smith. At the same time, we will issue a writ of advisory mandamus reversing the decision to allow the discovery sought from Rhode Island's former governor, from the former speaker of Rhode

---

[1] Had the public officials -- none of whom currently hold office -- appeared in their official capacities, we would have typically replaced them with the current office holders automatically. <u>See</u> Fed. R. App. P. 43(c)(2). However, there is some ambiguity over whether they were issued subpoenas in their official or individual capacities, especially since plaintiffs have sought both depositions and documents. Because it appears not to make any difference, given our disposition, and because no participant in these cases has sought any changes, we have retained the caption as it was when the cases were filed in this court.

Island's legislature, and from a former state representative. Our reasoning follows.

## I.

## A.

The Rhode Island Bridge Replacement, Reconstruction, and Maintenance Fund Act of 2016 ("RhodeWorks"), R.I. Gen. Laws §§ 42-13.1-1 – 42-13.1-17, authorizes the assessment of tolls in exchange for "the privilege of traveling on Rhode Island bridges to provide for replacement, reconstruction, maintenance, and operation of Rhode Island bridges," id. § 42-13.1-4(a). In enacting RhodeWorks, the legislature found that twenty-three percent of bridges in the state were structurally deficient and that other existing funding sources were insufficient to correct the deficiencies. Id. § 42-13.1-2(2), (4), (7).

American Trucking Associations, Inc., together with several trucking companies[2] (all "American Trucking"), challenges two features of RhodeWorks. First, American Trucking complains that RhodeWorks allows tolls to be assessed only against "large commercial trucks," id. § 42-13.1-4(a), which are defined as vehicles falling between Class 8 (single trailer, three or four axles) and Class 13 (multiple trailers, seven or more axles) of the Federal Highway Administration vehicle classification

---

[2] Cumberland Farms, Inc., M&M Transport Services, Inc., and New England Motor Freight, Inc.

- 4 -

schedule, id. § 42-13.1-3(3), while simultaneously prohibiting the assessment of tolls against passenger vehicles, id. § 42-13.1-5, as well as any future act authorizing the assessment of tolls against passenger vehicles unless such act has been approved by a majority of electors voting in a statewide referendum, id. § 42-13.1-4(a).

Second, American Trucking points out that RhodeWorks imposes statutory caps on the number of tolls that can be assessed against any single truck per facility and per day. Specifically, RhodeWorks provides that: (1) trucks cannot be charged more than "once per toll facility, per day in each direction," id. § 42-13.1-4(b); (2) trucks "making a border-to-border through trip" on I-95 cannot be charged more than $20 in each direction, id. § 42-13.1-4(c); and (3) trucks cannot be charged more than $40 per day, id. § 42-13.1-4(d).[3] American Trucking alleges that, according to a report prepared by CDM Smith, the toll caps increase the share of the total costs borne by out-of-state trucks from fifty-five percent to sixty percent.

In arguing that these aspects of RhodeWorks are unlawfully discriminatory, American Trucking highlights in its

---

[3] Within those limits, the toll amount per facility is set by the Rhode Island Department of Transportation through notice-and-comment procedures, id. § 42-13.1-4(a), and is to be based on "the costs of replacement, reconstruction, maintenance, and operation of Rhode Island's system of bridges and/or any portion or portions thereof," id. § 42-13.1-8.

Complaint that the Rhode Island Department of Transportation (RIDOT) first considered increasing the fuel tax to cover its bridge-related expenses but rejected that proposal because such a tax would have been "borne primarily by Rhode Island businesses and consumers." A tolling program, by contrast, would "shift[] a segment of the cost . . . onto semi-tractor trailer trucks that pass through the state without stopping." American Trucking next points to the following statement purportedly made by former Governor Raimondo, as reported in a local newspaper:

> The reason I prefer the tolling proposal [to the diesel-tax proposal] is because the majority of the burden is on out-of-state truckers and out-of-state companies who are using -- and I would say abusing -- our roads. . . . I don't like putting the burden squarely on the people and businesses of Rhode Island. . . . If you increase the diesel tax, it's every fisherman, every restaurant, every dry cleaner that delivers, every florist that delivers . . . . It really hits every Rhode Island business.

Along similar lines, a member of former Governor Raimondo's staff reportedly stated that "[t]he Governor has made it very clear she does not want to put the burden on the backs of Rhode Island families . . . . A significant share of the revenue will be raised from out-of-state users."

Later, former Governor Raimondo also reportedly indicated that she favored truck-only tolling because "the majority of [revenue] would come from out of state." And shortly

before the legislation was amended to exempt smaller trucks, American Trucking alleges that former Governor Raimondo stated, "We are willing to sit down with local companies and say, 'Is there a way we can make this less burdensome for local Rhode Island companies?' We're at the table discussing it."

In connection with their critique of RhodeWorks's design, American Trucking asserts that the drafters were aware of and intended to achieve the cost-shifting effects of the toll caps, citing that: (1) former House Speaker Nicholas Mattielo reportedly stated, "People should know that 60 percent of the money [for tolls] is going to come from out of state"; (2) former Representative Stephen Ucci reportedly stated, "The tolling relies on 60 percent revenue from out of state trucks who would have never paid to come through this state"; and (3) RIDOT Director Peter Alviti, when asked about the toll caps during a state legislative hearing, reportedly stated, "That's part of the mitigation that we put in place. That local businesses[,] they benefit."[4]

Tolling under RhodeWorks began in June 2018. The following month, American Trucking filed this action against the Rhode Island Turnpike and Bridge Authority and RIDOT Director

---

[4] The complaint also alleges that RhodeWorks is discriminatory because, shortly after its enactment, the Rhode Island legislature passed a law granting subsidies to local trucking companies. However, American Trucking has not reasserted this allegation in its briefs before us.

Alviti in his official capacity ("the RIDOT defendants"), contending that RhodeWorks facially violates the dormant Commerce Clause of the United States Constitution and seeking to permanently enjoin the collection of RhodeWorks tolls.

**B.**

Following a previous appeal on an unrelated jurisdictional issue, see Am. Trucking Ass'ns, Inc. v. Alviti, 944 F.3d 45 (1st Cir. 2019), American Trucking moved for a preliminary injunction against the collection of RhodeWorks tolls. After extensive briefing, the district court denied the motion for a preliminary injunction, finding that American Trucking had not established a sufficient likelihood of success on the merits. Am. Trucking Ass'ns, Inc. v. Alviti, C.A. No. 18-378-WES, 2020 WL 5443551, at *7-8 (D.R.I. Sept. 10, 2020). The district court explained, in relevant part, that the record was insufficiently developed to show that RhodeWorks discriminated against interstate commerce in either purpose or effect. Id. at *4, *6. In so holding, the district court specifically rejected American Trucking's argument that the statements by RhodeWorks' sponsors revealed a patently discriminatory legislative purpose, finding that the statements (if admissible) were "largely selective and presented without context." Id. at *4.

American Trucking thereafter sought to enforce subpoenas seeking documents and deposition testimony from several non-party

- 8 -

drafters and sponsors of RhodeWorks -- Governor Raimondo, Speaker Mattiello, and Representative Ucci ("the State Officials") -- to bolster its discriminatory-intent claims. Specifically, the subpoenas sought materials relating to: (1) any efforts to mitigate the economic impact on Rhode Island citizens; (2) the expected or actual impact of the toll caps on in-state vs. out-of-state truckers; (3) the expected or actual impact of tolling only certain classes of trucks on in-state vs. out-of-state truckers; (4) the potential impact on interstate commerce; (5) alternative methods for raising funds; (6) drafts of RhodeWorks and related, failed bills, including mark-ups, comments, red-lines, revisions, etc.; (7) communications between the former Governor and legislators regarding RhodeWorks or other methods of raising funds; and (8) the public statements made by the movants and others. The State Officials each moved to quash the subpoenas on the grounds that the legislative privilege shielded them from the discovery sought. Former Governor Raimondo also invoked the deliberative-process privilege.

American Trucking later issued subpoenas to CDM Smith as well, seeking: (1) deposition testimony and documents regarding the contractual relationship between RIDOT and CDM Smith; (2) the data and analysis collected and produced by CDM Smith; and (3) communications between RIDOT and CDM Smith about RhodeWorks. The defendants moved to quash the CDM Smith subpoenas, asserting

that CDM Smith's work was "essentially and inextricably linked" to the legislative and deliberative processes leading to the enactment of RhodeWorks. Thus, the defendants argued, the legislative and deliberative-process privileges protected CDM Smith to the same extent as the State Officials.

The district court denied all four motions to quash, finding in relevant part that American Trucking's interest in the discovery was greater than the State Officials' and the RIDOT defendants' interests in preventing disclosure. See Am. Trucking Ass'ns, Inc. v. Alviti, 496 F. Supp. 3d 699, 715 (D.R.I. 2020). The district court subsequently refused to certify its denial for interlocutory appeal under 28 U.S.C. § 1292(b). See Am. Trucking Ass'ns, Inc. v. Alviti, C.A. No. 18-378-WES, 2020 WL 7212149, at *4 (D.R.I. Dec. 7, 2020). Following that refusal, the non-party State Officials filed an interlocutory appeal. They also separately petitioned this court for a writ of advisory mandamus directing the district court to quash the subpoenas. The RIDOT defendants joined the mandamus petition, but not the direct appeal. We consolidated both proceedings.

## II.

### A.

We begin by considering our appellate jurisdiction. See Calvary Chapel of Bangor v. Mills, 984 F.3d 21, 26 (1st Cir. 2020). In general, "one to whom a subpoena is directed may not appeal the

- 10 -

denial of a motion to quash that subpoena but must either obey its commands or refuse to do so and contest the validity of the subpoena if he is subsequently cited for contempt on account of his failure to obey." United States v. Ryan, 402 U.S. 530, 532 (1971); see also Alexander v. United States, 201 U.S. 117, 121-22 (1906). Contrary to the State Officials' argument, "there is no special exception to [this] rule in cases involving claims of legislative or executive privilege." Corporacion Insular de Seguros v. Garcia, 876 F.2d 254, 257 (1st Cir. 1989); accord In re Grand Jury Subpoena, 909 F.3d 26, 27 (1st Cir. 2018) (recognizing that a non-party state agency ordinarily must defy a subpoena and incur a contempt order to perfect an appeal).

The State Officials assert that we may nevertheless exercise appellate jurisdiction pursuant to an Eleventh Circuit case holding that "one who unsuccessfully asserts a governmental privilege may immediately appeal a discovery order where he is not a party to the lawsuit." In re Hubbard, 803 F.3d 1298, 1305 (11th Cir. 2015). However, our opinion in Garcia rejected the line of cases on which In re Hubbard relied. See 876 F.2d at 257-58 & n.2. That decision binds this panel. See United States v. Lewis, 963 F.3d 16, 23 (1st Cir. 2020) (explaining that the law of the circuit must be followed unless undermined or called into doubt by subsequent authority). Accordingly, this Court has no jurisdiction to conduct an interlocutory review of the district

- 11 -

court's denial of the State Officials' motions to squash their subpoenas.

**B.**

In the alternative, the State Officials and the RIDOT defendants seek a writ of advisory mandamus. Although mandamus is "not a substitute" for a jurisdictionally proper appeal, it can be an appropriate "vehicle for obtaining immediate judicial review of nonfinal orders that would otherwise escape timely scrutiny." In re Recticel Foam Corp., 859 F.2d 1000, 1005 (1st Cir. 1988). Advisory mandamus is available in those extraordinary cases that present (1) an unsettled question of law (2) of substantial public importance (3) that is likely to recur, and (4) that is otherwise unappealable or unsusceptible to effective review or relief later on.[5] See In re Grand Jury Subpoena, 909 F.3d at 28 (citing United States v. Pleau, 680 F.3d 1, 4 (1st Cir. 2012) (en banc)).

**1.**

As to the State Officials, we think this is one such extraordinary case. First, the petition raises unsettled legal questions about the scope of the legislative privilege as applied

---

[5] This case does not involve "[t]he more commonly sought writ . . . of supervisory mandamus," which is available only when a district court issues a "palpably erroneous" order concerning "the limits of judicial power" that creates a "special risk of irreparable harm" to the party seeking mandamus. In re Grand Jury Subpoena, 909 F.3d at 28 (quoting United States v. Horn, 29 F.3d 754, 769 (1st Cir. 1994)).

- 12 -

to state lawmakers, both in general and in the context of the dormant Commerce Clause. We have never addressed these questions, and the lower courts have developed divergent approaches to answering them. See id. (finding a question unsettled because it was "unsettled in this circuit," and other circuits were split); Edward H. Cooper, 16 Fed. Prac. & Proc. Juris. § 3935.3 (3d ed.) (suggesting that mandamus may be used to resolve a discovery issue if there is "substantial uncertainty and confusion in the district courts").

Second, the degree to which state officials may be subjected to discovery in civil cases alleging violations of the federal constitution raises important questions about the appropriate balance of power between the states and the federal government. See In re Grand Jury Subpoena, 909 F.3d at 29 (noting "heightened federalism concerns" as a factor weighing in favor of exercising advisory mandamus jurisdiction over a state government's claim of privilege); cf. Horn, 29 F.3d at 770 (finding substantial importance because the question presented related to "the relationship between the Judicial Branch and the Executive Branch").

Third, we are confident that the questions presented are likely to recur, especially if we deny review. In just the past four years, three other circuits have considered the standard governing state lawmakers' claims of legislative privilege. See

- 13 -

Lee v. City of Los Angeles, 908 F.3d 1175, 1187–88 (9th Cir. 2018); Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Parish Gov't, 849 F.3d 615, 624 (5th Cir. 2017); In re Hubbard, 803 F.3d at 1311. And the parties cite to more than a dozen district court cases addressing the issue. See In re Grand Jury Subpoena, 909 F.3d at 28 (finding a likelihood of repetition based on "the fact that multiple circuits have already weighed in on the subject").

American Trucking asserts that if we narrow our focus to the dormant Commerce Clause context, questions of legislative privilege are considerably rarer. But at least one other district court in this circuit has recently considered claims of discriminatory purpose under the dormant Commerce Clause. See, e.g., Portland Pipe Line Corp. v. City of South Portland, 332 F. Supp. 3d 264, 303–08 (D. Me. 2018). We have little doubt that it will become increasingly common to subpoena state lawmakers in connection with such claims if we do not review the district court's order at this juncture. See In re Grand Jury Subpoena, 909 F.3d at 28 (predicting that the district court's ruling might increase the likelihood of recurrence). Given this backdrop, exercising advisory mandamus jurisdiction to review the district court's order denying the State Officials' motions to quash will "assist other jurists, parties, or lawyers" in addressing similar issues. Horn, 29 F.3d at 770 (quoting In re Bushkin Assocs., Inc., 864 F.2d 241, 247 (1st Cir. 1989)).

- 14 -

Finally, as we recognized in In re Grand Jury Subpoena, the ordinary course of perfecting an appeal by incurring a contempt order is sometimes "less readily available" to state actors than to private parties. 909 F.3d at 29. Our controlling precedent effectively deems that interest insufficient to create a categorical exception that would allow an appeal of discovery orders by right, Garcia, 876 F.2d at 257-58 & n.2, but it still merits some weight in the calculus of deciding whether to exercise mandamus review, In re Grand Jury Subpoena, 909 F.3d at 29.

For all four of these reasons collectively, we conclude that exercising advisory mandamus jurisdiction to review the district court's order as to the State Officials is appropriate.

## 2.

As to the order allowing discovery from the State's consultant, CDM Smith, the second factor weighs much less heavily in favor of mandamus review. Simply put, concerns of comity and federalism are less pointed when the discovery is aimed in the first instance at a private party. Relatedly, as a private party, CDM Smith can more readily obtain review by first incurring a finding of contempt. To the extent it is unwilling to do so because it does not share the state's interest in confidentiality, that is simply another ramification of the fact that the information has already been given to a private third party. We therefore regard the questions posed by the CDM Smith subpoena as

- 15 -

falling more into the ordinary case in which mandamus is unavailable to review "[d]ecisions regarding the scope of discovery." In re Insurers Syndicate for Joint Underwriting of Medico-Hosp. Pro. Liab. Ins., 864 F.2d 208, 211 (1st Cir. 1988) (quoting In re Recticel Foam Corp., 859 F.2d at 1006). Accordingly, we decline to review the claim of legislative privilege with respect to the information sought by the CDM Smith subpoenas.

## III.

We turn next to the merits of the State Officials' argument that the district court erred in denying their motions to quash. We review de novo the denial of a motion to quash to the extent that it turns on purely legal questions, and for abuse of discretion otherwise. See In re Porsche Automobil Holding SE, 985 F.3d 115, 120 (1st Cir. 2021).

Because much of the parties' briefing revolves around the scope of the legislative privilege generally, we start by setting out an overview of the legal framework governing claims of legislative privilege and the closely related doctrine of legislative immunity, and then we address the State Officials' specific claims in this case.

## A.

The Speech or Debate Clause of the U.S. Constitution, Art. I, § 6, cl. 1, provides in relevant part that "for any Speech

- 16 -

or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." The Supreme Court has interpreted this clause as granting federal lawmakers absolute immunity from civil and criminal liability for their legislative acts. See Kilbourn v. Thompson, 103 U.S. 168, 201, 204-05 (1880); United States v. Johnson, 383 U.S. 169, 180 (1966). The Speech or Debate Clause also establishes an absolute evidentiary privilege that protects federal lawmakers from having evidence of their legislative acts introduced in a proceeding against them, see Johnson, 383 U.S. at 182-85, and from being compelled to testify about their legislative acts before a grand jury, see United States v. Gravel, 408 U.S. 606, 615-16 (1972).[6]

The "central role" of the Speech or Debate Clause is "to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary." Id. at 617. In this way, the clause protects Congress from interference by its coequal branches and thereby "reinforc[es] the separation of powers so deliberately established by the Founders." Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 502 (1975) (quoting Johnson, 383 U.S. at 178). But the clause also protects legislators from

_____

[6] The terms "immunity" and "privilege" have at times been used interchangeably. See, e.g., Gravel, 408 U.S. at 620. However, following the Supreme Court's lead in United States v. Gillock, 445 U.S. 360, 368-73 (1980), we use "immunity" only when discussing potential liability and "privilege" only when referring to evidentiary issues.

- 17 -

proceedings that "divert their time, energy, and attention from their legislative tasks," id. at 503, otherwise "delay and disrupt the legislative function," id., or "deter[] . . . the uninhibited discharge of their legislative duties," Barr v. Matteo, 360 U.S. 564, 575 (1959) (quoting Tenney v. Brandhove, 341 U.S. 367, 377 (1951)). The Supreme Court has described these latter concerns as relating to "legislative independence." Gillock, 445 U.S. at 369, 371.

Assertions of legislative immunity and privilege by state lawmakers stand on different footing. For starters, they are governed by federal common law rather than the Speech or Debate Clause, which by its terms applies only to federal legislators. See Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency, 440 U.S. 391, 403-05 (1979); Gillock, 445 U.S. at 366-67 & n.5. And the common-law legislative immunity and privilege are less protective than their constitutional counterparts. See Gillock, 445 U.S. at 372-73 (legislative immunity); id. at 366-67, 374 (legislative privilege). That is because the separation-of-powers rationale underpinning the Speech or Debate Clause does not apply when it is a state lawmaker claiming legislative immunity or privilege. See id. at 370 (explaining that "we do not have the struggles for power between the federal and state systems such as inspired the need for the Speech or Debate Clause" because "the Supremacy Clause

dictates that federal [law] will prevail over competing state exercises of power").

Still, "principles of comity command careful consideration." Id. at 373. And the interests in legislative independence served by the Speech or Debate Clause remain relevant in the common-law context. See id. at 372 (explaining that "sensitivity to interference with the functioning of state legislators" justifies granting state lawmakers absolute immunity from civil liability for their legislative acts); Lake Country Ests., 440 U.S. at 405 (quoting Tenney, 341 U.S. at 377). For these reasons, federal courts will often sustain assertions of legislative privilege by state legislatures except when "important federal interests are at stake," such as in a federal criminal prosecution. Gillock, 445 U.S. at 373; see also Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 268 (1977) (indicating that state or local lawmakers "might be called to the stand" in a civil case to testify about legislative purpose only in "some extraordinary instances," and "even then such testimony frequently will be barred by privilege").

**B.**

Turning to the State Officials' assertion of legislative privilege in this case, we note the issues that are not in dispute. First, no party disputes that the subpoenas issued to the State Officials sought evidence of the State Officials' legislative acts

- 19 -

and underlying motives. Similarly, no party disputes that, if the legislative privilege applies, the discovery requested by those subpoenas falls within its scope. Cf. Gravel, 408 U.S. at 628-29 (holding that the Speech or Debate Clause's legislative privilege prohibited questioning a Senator about one of his legislative acts; "the motives and purposes behind" the act; "communications between the Senator and his aides" related to the act; and his "preparation for" the act). Second, the parties agree that the former Governor, though not a member of the state legislature, possessed whatever legislative privilege that the state legislators possessed. Cf. Bogan v. Scott-Harris, 523 U.S. 44, 54-55 (1998) (holding that local executive officials could invoke legislative immunity with respect to their legitimate legislative acts); accord Nat'l Ass'n of Social Workers v. Harwood, 69 F.3d 622, 630 (1st Cir. 1995) (explaining that "the prophylaxis of the Clause also extends to legislative acts performed by non-legislators"). Finally, the parties do not appear to seriously dispute that the legislative privilege may be invoked at the discovery stage (not just at trial); that the privilege can shield state lawmakers from having to produce documents; or that, in some cases, the privilege may apply even if the state lawmakers are not defendants in the action. Thus, the only question is whether the district court committed an error of law or exceeded the scope of its discretion in determining that American Trucking's interest in obtaining evidence of the

State Officials' subjective motives outweighed the comity considerations implicated by the subpoenas.

To start, no representative of the federal government asserts any interest in overbearing the assertion of the legislative privilege in this case. We have before us neither a federal criminal case nor a civil case in which the federal government is a party. See Gillock, 445 U.S. at 373 (holding that a federal criminal prosecution was important enough to overcome a state lawmaker's assertion of legislative privilege); In re Hubbard, 803 F.3d at 1309 n.10 (suggesting that discovery may be more searching in "[a]n official federal investigation into potential abuses of federal civil rights" by state officials than in "a private lawsuit attacking a facially valid state statute by attempting to discover the subjective motivations of some of the legislative leaders and the governor who supported it"). Both courts of appeals that have considered a private party's request for such discovery in a civil case have found it barred by the common-law legislative privilege. See In re Hubbard, 803 F.3d at 1311-12; Lee, 908 F.3d at 1186-88.

So American Trucking is reduced to arguing that the discovery in this private civil action nevertheless implicates important federal interests because the federal government has an interest in uncovering and restraining violations of the dormant Commerce Clause. Certainly this lawsuit does implicate the federal

interest in enforcing the dormant Commerce Clause, as the district court found.  See Am. Trucking Ass'ns, 496 F. Supp. 3d at 714. And the Supreme Court has recently reiterated that the dormant Commerce Clause "reflect[s] a 'central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.'"  Tenn. Wine & Spirits Retailers Ass'n v. Thomas, 139 S. Ct. 2449, 2461 (2019) (quoting Granholm v. Heald, 544 U.S. 460, 472 (2005)).

But American Trucking's argument suggests a broad exception overriding the important comity considerations that undergird the assertion of a legislative privilege by state lawmakers.  Many cases in federal courts assert violations of federal law by state legislators who are not joined as parties to the litigation.  Were we to find the mere assertion of a federal claim sufficient, even one that addresses a central concern of the Framers, the privilege would be pretty much unavailable largely whenever it is needed.

We need not reject altogether the possibility that there might be a private civil case in which state legislative immunity must be set to one side because the case turns so heavily on subjective motive or purpose.  This is not such a case, however,

because proof of the subjective intent of state lawmakers is unlikely to be significant enough in this case to warrant setting aside the privilege.  Cf. In re Hubbard, 803 F.3d at 1312 (quashing the subpoena because "the First Amendment does not support . . . a challenge to an otherwise constitutional statute based on the subjective motivations of the lawmakers who passed it").

The district court reasoned that the evidence sought by American Trucking's subpoenas would shed light on the State Officials' intent in drafting RhodeWorks, which is "relevant to the dormant Commerce Clause."  Am. Trucking Ass'ns, 496 F. Supp. 3d at 712-13.  And, in the district court's view, the discovery sought would provide necessary context for the public statements made by the State Officials and their staff regarding RhodeWorks, which otherwise "appear[ed] to be patent statements of discriminatory intent."  Id. at 713.  But see Am. Trucking Ass'ns, 2020 WL 5443551, at *4 (finding that the public statements, without context, could not establish a likelihood of success on the merits of American Trucking's discriminatory-intent claim).[7]

We certainly agree that interrogating the State Officials could shed light on and provide context concerning their subjective motivations and public comments.  And in theory it is

---

[7]  The public statements speak of placing much or most of the RhodeWorks tolling burden on out-of-staters, but they do not admit that such a burden is disproportionate to the relevant use of the bridges by out-of-staters.

often said that a violation of the dormant Commerce Clause might be based on either discriminatory purpose or effect. See Chem. Waste Mgmt. v. Hunt, 504 U.S. 334, 344 n.6 (1992) (stating that "a finding that state legislation constitutes 'economic protectionism' may be made on the basis of either discriminatory purpose or discriminatory effect" (cleaned up) (quoting Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 270 (1984))); S.C. State Highway Dep't v. Barnwell Bros., Inc., 303 U.S. 177, 184 n.2 (1938) (similar). But it is difficult to conceive of a case in which a toll that does not discriminate in effect could be struck down based on discriminatory purpose. It is also equally difficult to conceive of a toll that has a substantial discriminatory effect, yet is saved by the mere absence of proof that the effect was intended. See Comptroller of Treasury of Md. v. Wynne, 575 U.S. 542, 561 n.4 (2015) ("The Commerce Clause regulates effects, not motives, and it does not require courts to inquire into voters' or legislators' reasons for enacting a law that has a discriminatory effect."). Neither party presents us with an example of either such case. And we are not the first to notice that "a law motivated wholly by a protectionist intent might fail to produce significant discriminatory effects." Kathleen M. Sullivan & Gerald Gunther, Constitutional Law 275 (15th ed. 2004); see also All. of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 36 n.3 (1st Cir. 2005) ("[T]here is some reason to question whether a showing of discriminatory

- 24 -

purpose alone will invariably suffice to support a finding of constitutional invalidity under the dormant Commerce Clause.").

The Supreme Court has "repeatedly . . . focused [its] Commerce Clause analysis on whether a challenged scheme is discriminatory in 'effect,'" and "emphasized that 'equality for the purposes of . . . the flow of commerce is measured in dollars and cents, not legal abstractions.'" Associated Indus. of Mo. v. Lohman, 511 U.S. 641, 654 (1994) (third alteration in original) (first quoting Bacchus Imports, 468 U.S. at 270, and then quoting Halliburton Oil Well Cementing Co. v. Reily, 373 U.S. 64, 70 (1963)); see also City of Philadelphia v. New Jersey, 437 U.S. 617, 626-27 (1978) (abandoning a search for the legislature's "ultimate purpose" because the challenged legislation was discriminatory "on its face and in its plain effect"). "Discrimination, like interstate commerce itself, is a practical conception[]" that must be proven by evidence of "substantial distinctions and real injuries." Gregg Dyeing Co. v. Query, 286 U.S. 472, 481 (1932). Indeed, in American Trucking Associations v. Scheiner, the most factually analogous precedent cited by American Trucking in its motion for a preliminary injunction, the Court found that the challenged regulation was discriminatory based on proof of its effects alone. 483 U.S. 266, 286 (1987); accord Trailer Marine Transp. Corp. v. Rivera Vazquez, 977 F.2d 1, 11 (1st Cir. 1992). Thus, evidence that will likely bear on the

presence or absence of discriminatory effects in the actual results of RhodeWorks toll collections is more probative and more readily discoverable than evidence relating to legislative intent.

To the extent that discriminatory intent is relevant, the probative value of the discovery sought by American Trucking is further reduced by the inherent challenges of using evidence of individual lawmakers' motives to establish that the legislature as a whole enacted RhodeWorks with any particular purpose. The Supreme Court has warned against relying too heavily on such evidence. See United States v. O'Brien, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."); cf. Va. Uranium, Inc. v. Warren, 139 S. Ct. 1894, 1907-08 (2019) (plurality opinion) ("Trying to discern what motivates legislators individually and collectively invites speculation and risks overlooking the reality that individual Members of Congress often pursue multiple and competing purposes, many of which are compromised to secure a law's passage and few of which are fully realized in the final product[,] . . . [and] risk[s] displacing the legislative compromises actually reflected in the statutory text."). Thus, when evaluating whether a state statute was motivated by an intent to discriminate against interstate commerce, we ordinarily look first to "statutory text, context,

and legislative history," as well as to "whether the statute was 'closely tailored to achieve the [non-discriminatory] legislative purpose'" asserted by the state.  Family Winemakers of Cal. v. Jenkins, 592 F.3d 1, 13 (1st Cir. 2010) (quoting Gwadosky, 430 F.3d at 38).  To be clear, we do not hold that evidence of individual legislators' motives is always irrelevant per se; we mean only to point out that it is often less reliable and therefore less probative than other forms of evidence bearing on legislative purpose, and this case does not appear to present a contrary example.

In sum, even assuming that a state's legislative privilege might yield in a civil suit brought by a private party in the face of an important federal interest, the need for the discovery requested here is simply too little to justify such a breach of comity.  At base, this is a case in which the proof is very likely in the eating, and not in the cook's intentions.

**IV.**

For the foregoing reasons, the State Officials' interlocutory appeal is dismissed for lack of jurisdiction.  The petition for a writ of advisory mandamus is denied as to the CDM subpoena, but granted as to the State Officials.  The writ shall

issue in accordance with this opinion directing the district court to reverse its denial of the State Officials' motions to quash.[8]

---

[8] Because we find that the legislative privilege applies, we need not address the former governor's argument that the deliberative-process privilege independently bars the discovery sought.